1  BRIEN J. FARRELL, City Attorney (SBN 088318)
   MICHAEL J. CASEY, Assistant City Attorney (SBN 095730)
2  City of Santa Rosa
   100 Santa Rosa Avenue, Room 8
3  P. O. Box 1678
   Santa Rosa, California 95402
4  Telephone: (707) 543-3040
   Facsimile: (707) 543-3055
5
   Attorneys for the City of Santa Rosa
6

**ENDORSED**
**FILED**

JAN 2 2 2007

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

7

8                    SUPERIOR COURT OF CALIFORNIA

9                         COUNTY OF SONOMA

10  CITY OF SANTA ROSA,                    Case No. SCV-237667

11          Plaintiff,                     NOTICE OF MOTION AND MOTION FOR
                                           LEAVE TO FILE AN AMENDED
    v.                                     COMPLAINT
12
    RAMAN D. PATEL, individually and as
13  trustee of the Raman D. and Jashu R. Patel
    Family Trust, Raman D. and Jashu R.    (Unlimited Civil Case)
    Residual Trust and Raman D. and Jashu R.
14  Patel Survivor's Trust, JAS 4 RAY
    PROPERTIES, L.P., RITA PATEL, DAVID     Date:  2/20/07
15  STAFFORD, PRITA PATEL and DOES 3-       Time:  8:30 a
    20,                                     Courtroom: 5 18
16                                          Judge:     Hon. Knoel Owen
            Defendants.                     Trial Date: March 2, 2007
17  _____/

18

19

20          TO DEFENDANTS AND THEIR ATTORNEY OF RECORD:

21          **PLEASE TAKE NOTICE** that on ___2/20/07___, at __8:30 a.m. in__

22  Department _5/8_ of the above-entitled court, located at ___1450 Guerneville Road, Santa Rosa, CA 95403___, Plaintiff

23  City of Santa Rosa will seek leave of court to file an amended complaint to add a cause of action

24  under *Business & Professions Code* §17200, et seq. for unfair business practices. In addition to

25  seeking leave, plaintiff will request an order of the court to allow filing of a first amended

26  complaint and that the amended complaint be deemed served as of the date the motion is granted.

27  Plaintiff seeks leave in the interests of justice.

28          This motion is based on the attached documents, including the supporting declaration of

Notice of Motion - Leave to File Amended Complaint     1

1  Michael J. Casey, the Memorandum of Points and Authorities in Support thereof; and the

2  pleadings on file.

3      The following allegations are proposed to be added:

4                        "SECOND CAUSE OF ACTION

5                        Unlawful Business Practices

6               (Business and Professions Code §17200, et seq.)

7      12.    Plaintiff incorporates by reference Paragraphs 1 through 10 as though fully set

8  forth herein.

9      13.    Defendants' maintenance of their property, and the operation of their motel in the

10  above-described condition, was an integral part of their unlawful and unfair business practice.

11  This practice consisted of, among other things, permitting and encouraging prostitution, acts of

12  prostitution and solicitation of prostitution on their business premises.  This practice also

13  consisted of charging and collecting higher room rates from prostitutes and/or their pimps than

14  what was charged and collected from regular customers.  Consequently, defendants gained an

15  unfair business advantage over similarly situated business operators and unfairly and illegally

16  profited from the criminal activity they permitted to occur on their business premises.

17      14.    Plaintiff believes that the defendants' actions violate, inter alia, *California Civil*

18  *Code §3479*, as well as *California Penal Code §§*266i:, 266h, 315, 316, 653.22 and 11225, et.

19  seq.

20      15.    Defendants threaten to, and unless restrained will, continue to engage in these

21  unlawful business practices.  In addition to seeking injunctive relief to enjoin these practices and

22  conditions, plaintiff also requests restitution and disgorgement of all profits and earnings made as

23  a result thereof.  Furthermore, plaintiff seeks the appointment of a receiver under *Business &*

24  *Professions Code §*17203.

25      16.    Finally, plaintiff requests that a civil penalty of $2,500 be imposed against

26  each defendant for each underlying predicate act or violation of law constituting an unlawful

27  business practice."

28  \\

1    These allegations begin on page 5, line 6 and continue to page 5, line 26 of the attached

2  Proposed First Amended Complaint.

3

4  Dated: January 19 , 2007

5  MICHAEL J. CASEY
   Assistant City Attorney
   Attorney for the City of Santa Rosa

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   BRIEN J. FARRELL, City Attorney (SBN 088318)
    MICHAEL J. CASEY, Assistant City Attorney (SBN 095730)
2   City of Santa Rosa
    100 Santa Rosa Avenue, Room 8
3   P. O. Box 1678
    Santa Rosa, California 95402
4   Telephone:  (707) 543-3040
    Facsimile:   (707) 543-3055
5
    Attorneys for the City of Santa Rosa
6

7                    SUPERIOR COURT OF CALIFORNIA

8                       COUNTY OF SONOMA

9
    CITY OF SANTA ROSA,                    Case No. SCV-237667
10
              Plaintiff,                   **PLAINTIFF'S MEMORANDUM OF**
11  v.                                     **POINTS AND AUTHORITIES IN**
                                           **SUPPORT OF MOTION FOR LEAVE TO**
12  RAMAN D. PATEL, individually and as    **FILE AN AMENDED COMPLAINT**
    trustee of the Raman D. and Jashu R. Patel
13  Family Trust, Raman D. and Jashu R.
    Patel Residual Trust and Raman D. and Jashu R.
14  Patel Survivor's Trust, JAS 4 RAY       (Unlimited Civil Case)
    PROPERTIES, L.P., RITA PATEL, DAVID
15  STAFFORD, PRITA PATEL and DOES 3-      Date:       2/20/07
    20,                                    Time:       8:30 a
16                                         Courtroom:  5 7 8
              Defendants.                  Judge:      Hon. Knoel Owen
17  _____/  Trial Date:  March 2, 2007

18

19

20                              **I.**

21                          <u>Introduction</u>

22      On September 19, 2006, plaintiff obtained an immunity and protective order for the

23  depositions of defendants' former managers. These depositions were taken September 27 and

24  28, 2006, the week before the trial call date of October 6, 2006. The case trailed one week and

25  was reset for trial on March 2, 2007.

26      The City Attorney then requested permission from the District Attorney to add a claim

27  under *Business & Professions Code* §17200. The District Attorney granted permission on

28  \\
    Memorandum of Points & Authorities            1

1  January 10, 2007.

2    Should the court grant leave to file an amended complaint when the proposed amendment

3  relates to the same general set of facts, there is no surprise or prejudice to the defendants and no

4  additional discovery is required?

## II.

### Background

7    This is a Red Light Abatement Action against the owners and operators of the Llano

8  Motel. The lawsuit was filed on October 26, 2005, the culmination of several months of

9  investigation by the Santa Rosa Police Department.

10    The defendants employed two on-site managers, Kelli Richardson and Arthur Savano,

11  who were arrested on prostitution and pimping related charges in October 2005.

12    The complaint was filed under *Penal Code* § 11225 and *Code of Civil Procedure* §731. It

13  contains a single cause of action alleging a public nuisance. Injunctive relief, an abatement

14  order, civil penalties, disgorgement/restitution of profits and attorneys' fees and costs were prayed

15  for.

16    After their arrest, the managers retained criminal defense attorneys, Jack Montgomery

17  and Jamie Thistlethwaite. The Patel defendants were deposed over the summer of 2006. When

18  Ms. Richardson and Mr. Savano were deposed, on August 9 and 16, 2006, they both invoked

19  their 5th Amendment right not to incriminate themselves. Plaintiff moved for an order

20  compelling the managers' depositions and for a protective order and grant of immunity. The

21  motion was not opposed by either the defendants or the District Attorney. Judge Knoel Owen

22  granted the motion on September 19, 2006, and the managers testified as follows on September

23  28 and 29, 2006:

24    • The Patel family was aware of the prostitution activity and set increased rates for

25      the prostitutes and implemented "house rules" for the working girls to follow to

26      avoid police detection.

27    • Most of the revenue generated from the motel in 2005 was from prostitution. In

28      September and October 2005, 90-95% of the rent was collected from prostitutes.

1  •     Some of the girls were "regulars" and would stay at the motel for days on end.

2  •     Many prostitutes were renting motel rooms in 2005. They were using their rooms

3        to do their business. The prostitutes also solicited men who came into the motel

4        parking lot.

5  •     The Patels kept raising the room rates for the prostitutes, but not for the other

6        customers.

7  •     While the police told them not to rent to prostitutes, Rita Patel directed the

8        managers to continue renting to them.

9       The trial call was held on October 6, 2006, and the parties trailed for one week before the

10  trial was rescheduled for March 5, 2007. In the interim, based on the deposition testimony of the

11  defendants' managers, the City Attorney sought consent from the District Attorney to bring an

12  unfair business practice claim. This consent was verbally given on January 10, 2007.

### III.

### Discretion to Allow Amendments Should

### Be Liberally Applied

16       The court has discretion to allow amendments to a complaint in the interest of justice.[1]

17  And the court may allow the amendment at any time before or after the commencement of trial.[2]

18  California has adopted a policy of "great liberality" in permitting amendments at any stage of the

19  proceedings.[3] Discretion is liberally applied because judicial policy favors resolution of all

20  disputed matters in the same lawsuit.[4] As long as there is no prejudice shown to the defendant,

21  the liberal policy prevails and it is an abuse of discretion to refuse the amendment.[5] This is true

---

[1]  *Code of Civil Procedure* §473(a)(1).

[2]  *Code of Civil Procedure* §576.

[3]  5 Witkin, *Calif. Proc., Pleading* §1126.

[4]  *Nestle v. Santa Monica* (1972) 6 Cal. 3d 920, 932.

[5]  *Mesler v. Bragg Management Co.* (1985) 39 Cal. 3d 290, 297.

Memorandum of Points & Authorities       3

1  even if the matter is on fast track and the amendment will require a continuance.[6]

2  In *Atkinson v. Elk Corporation*[7], the plaintiff filed a motion to add two causes of action.

3  One was for violations of *Business & Professions Code §17200*. The trial denied the motion and

4  entered a judgment of non-suit. This was reversed and remanded with instructions to grant leave

5  to amend the complaint. An abuse of discretion was found because there was no showing that

6  the opposing party was misled or prejudiced by the amendment.[8] Furthermore, the court noted

7  that it was irrelevant that a new legal theory was introduced as long as the proposed amendment

8  related to the same general set of facts.[9]

9  A change in legal theory which makes admissible evidence damaging is **not** the kind of

10  prejudice the court will consider.[10] It is difficult to see how a defendant can be prejudiced by an

11  amendment that simply adds an additional theory of liability.[11]

12  In *Higgins v. Del Faro*,[12] the trial court entered judgment on the pleadings after a motion

13  to amend on the day of trial was denied. The Court of Appeal reversed, noting that where no

14  prejudice is shown to the adverse party, the liberal rule of allowance prevails.[13] In other words,

15  delay alone is not a ground for denial where it does not mislead or prejudice a defendant.[14] In

16  fact, even if there is an "unreasonable" delay in moving to amend it is an abuse of discretion to

17  deny leave where the opponent is not misled or prejudiced by the amendment.[15]

18

19

20  [6]  *Honig v. Financial Corp. of America* (1992) 6 Cal. App. 4th 960, 967.

21  [7]  (2003) 109 Cal. App. 4th 739.

22  [8]  *Id.*, 761.

23  [9]  *Id.*, See also *Kittredge Sports Co. v. Superior Court* (1989) 213 Cal. App. 3d 1045, 1048.

24  [10]  *Hirsa v. Superior Court* (1981) 118 Cal. App. 3d 486, 490.

25  [11]  *Id.*

26  [12]  (1981) 123 Cal. App. 3d 558.

27  [13]  *Id.*, 564-565.

28  [14]  *Id.*

[15]  *Kittredge Sports Co. v. Superior Court* (1989) 213 Cal. App. 3d 1045, 1048.

IV.

**The Testimony of Defendants' Managers Gives Rise To**

**A *Business and Professions Code §17200* Claim**

Under *Business & Professions Code* §17206, any person who has engaged in unfair competition **shall** be liable for a civil penalty up to $2,500 for each violation. Unfair competition is **any** unlawful, unfair or fraudulent business act or practice.[16] §17200 prohibits any act forbidden by law, whether it is federal, state, municipal, statutory, regulatory or court-made.[17] Moreover, the Supreme Court has recognized that even though a specific statutory enforcement scheme exists, **a parallel action for unfair competition is proper** pursuant to applicable provisions of the *Business & Professions Code*.[18] The remedies and penalties provided for in the *Business & Professions Code* are cumulative to each other and to the penalties and remedies available under all other laws of the state.[19]

The testimony of the defendants' managers supports a claim that the defendants were engaged in unlawful business practices.

V.

**There is No Prejudice to the Defendants**

Paragraph 7 of the complaint charges the defendants with conducting a public nuisance - a house of prostitution - on their property. Paragraph 7(f) alleges,

"...The police arrested the co-managers for pimping and running a house of prostitution. They admitted to the officers that the owners of the motel encouraged the renting of rooms to prostitutes. And they admitted that the owners set the prices and "house rules" for the prostitutes. Generally, the room rate is $54.50 daily, for a single person, and $65.00 for two persons. Hookers and pimps

---

[16] *Business & Professions Code* §17205.

[17] *Saunders v. Superior Court* (1994) 27 Cal. App. 4th 832, 838-839; *People v. McHale* (1979) 25 Cal. 3d 626, 632.

[18] *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 572.

[19] *Business & Professions Code* §17205.

1    are charged approximately $150.00 per girl whether or not they share a room.

2    One of the managers admitted to the police that the majority of the motel's

3    business is from prostitutes."

4    Paragraph 5 of the complaint also describes, in general terms, the illegal activities taking

5    place at the defendants' motel. In addition, the defendants were served with numerous

6    declarations from police officers, detailing prostitution, when plaintiff applied for a temporary

7    restraining order. Numerous police reports were also provided to defendants' prior attorneys,

8    Stephen Turer and Chris Andrian.

9    The proposed amendment relates to the same "general set of facts" in controversy and

10    comes as no surprise to the defendants. Plaintiff merely seeks an additional legal theory -

11    unlawful business practices - based on testimony obtained the week before the initial trial call.

12    There was no unreasonable delay on plaintiff's part as the District Attorney granted consent on

13    January 10, 2007. Plaintiff could not have applied for leave sooner as the assigned judge does ex

14    partes on Mondays and January 15, 2007 was a legal holiday. In any event, unreasonable delay is

15    not a ground for denying leave where a defendant is not misled or prejudiced.[20] This is especially

16    true here where defendants took the opportunity to extensively cross-examine the two witnesses

17    at their depositions.

18                                **VI.**

19                              **Conclusion**

20    Plaintiff could not obtain the deposition testimony of defendants' employees until after

21    the court issued a protective order and grant of immunity. The depositions were then expedited.

22    Plaintiff has moved as quickly as possible after the District Attorney granted consent.[21]

23    \\

24    \\

25    \\

26

27    [20]    *Kittredge Sports Co., supra.*

28    [21]    The City Attorney may prosecute an unlawful business practice case with the consent of the District
        Attorney per *Business & Professions Code §§*17204, 17206.

1    The proposed amendment adds a new legal theory to the same pending general set of

2    facts. Defendants have not been misled, nor are they prejudiced by the amendment. The court

3    should continue the liberal policy of allowing amendments and grant this motion. Plaintiff

4    further requests that it be allowed to file the proposed First Amended Complaint and that it be

5    deemed served upon all defendants as of the date the motion is granted.

6

7

8    Dated: January 22, 2007

9                                                          MICHAEL J. CASEY
                                                            Assistant City Attorney
                                                            Attorney for the City of Santa Rosa

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  BRIEN J. FARRELL, City Attorney (SBN 088318)
2  MICHAEL J. CASEY, Assistant City Attorney (SBN 095730)
   City of Santa Rosa
   100 Santa Rosa Avenue, Room 8
3  P. O. Box 1678
   Santa Rosa, California 95402
4  Telephone:  (707) 543-3040
   Facsimile:   (707) 543-3055
5
   Attorneys for the City of Santa Rosa
6

**ENDORSED**
**FILED**

JAN 2 2 2007

SUPERIOR COURT OF CALIFORNIA
COUNTY OF SONOMA

7

8                    SUPERIOR COURT OF CALIFORNIA

9                         COUNTY OF SONOMA

10  CITY OF SANTA ROSA,                    Case No. SCV-237667

11                 Plaintiff,              DECLARATION OF MICHAEL J. CASEY
                                           IN SUPPORT OF MOTION FOR LEAVE
    v.                                     TO FILE AN AMENDED COMPLAINT
12
    RAMAN D. PATEL, individually and as
13  trustee of the Raman D. and Jashu R. Patel
    Family Trust, Raman D. and Jashu R. Patel    (Unlimited Civil Case)
    Residual Trust and Raman D. and Jashu R.
14  Patel Survivor's Trust, JAS 4 RAY
    PROPERTIES, L.P., RITA PATEL, DAVID    Date:      2/20/07
15  STAFFORD, PRITA PATEL and DOES 3-      Time:      8:30 a
    20,                                    Courtroom: S18
16                                         Judge:     Hon. Knoel Owen
                   Defendants.             Trial Date:  March 2, 2007
17  _____/

18

19

20        I, Michael J. Casey, declare:

21        1.      I am employed as an Assistant City Attorney for the City of Santa Rosa and

22  represent the plaintiff in this case. I am licensed to practice law before all courts of the State of

23  California.

24        2.      I caused this lawsuit to be filed on or about October 26, 2005, and was informed

25  and believed that the defendants' managers, Kellie Richardson and Arthur Savano, had been

26  arrested on prostitution and pimping related charges a few days before. After the City obtained

27  an Ex Parte Temporary Restraining Order, the parties stipulated to a preliminary injunction. At

28  that time, the Patel defendants were represented by Stephen Turer and Chris Andrian. Settlement

Declaration of Michael J. Casey                    1

1  negotiations were taking place and the parties had agreed to mediation. The defendants then

2  changed lawyers.

3       3.    When I initially noticed the depositions of Kellie Richardson and Arthur Savano,

4  their attorneys, Jack Montgomery and Jamie Thistlethwaite, each requested that the depositions

5  be put over. I took the defendants' depositions between August 16 and September 13, 2006.

6  When I took the initial depositions of Kellie Richardson and Arthur Savano on August 9 and 16,

7  2006, each of them exercised their Fifth Amendment rights.

8       4.    I filed a motion to compel the depositions of the two managers and also requested

9  a protective and immunity order. Judge Knoel Owen granted motion on September 19, 2006.

10 Their depositions were then taken on September 28 and 29, 2006. The trial call in this matter

11 was set for October 6, 2006.

12      5.    In response to a request for production of documents served upon the City by Mr.

13 Turer, I provided numerous police reports to the defendants regarding the prostitution-related

14 activity at the defendants' motel.

15      6.    During their depositions, both managers testified that they were employed by the

16 defendants to manage the hotel. They testified about the prostitution activity that took place at

17 the motel, that the prostitutes rented room, and solicited customers in the motel parking lot.

18 They also testified that the defendants set "house rules" for the prostitutes and told the managers

19 to charge the prostitutes more money for the rooms than the regular customers. The managers

20 also testified that in September and October 2005, approximately 90% of the motel revenue was

21 collected from prostitution. Attached as Exhibit A are true and correct portions of the deposition

22 transcript for Kellie Richardson. Attached as Exhibit B are true and correct portions of the

23 deposition transcript for Arthur Savano. The individual defendants were present at Ms.

24 Richardson's deposition with their attorney, Frank Weiser. Rita Patel and David Stafford

25 attended the deposition of Mr. Stafford. Mr. Weiser joined this deposition by telephone. He

26 thoroughly cross-examined both witnesses.

27      7.    Trial call was held on October 6, 2006, and the matter trailed the following week

28 without being called for trial. The matter was then reset for trial on March 2, 2007.

Declaration of Michael J. Casey          2

8.      I am informed and believe that the City Attorney for the City of Santa Rosa, Brien Farrell, requested consent from the District Attorney, Stephen Passalacqua, in early to mid-November, 2006 to add a cause of action for a *Business & Professions Code §17200* violation. This request was made on the basis of the evidence developed during the depositions of Kellie Richardson and Arthur Savano.

9.      In early January 2007, I was contacted by Chief Deputy District Attorney, Diana Gomez, and invited to a meeting with her and Assistant District Attorney, Larry Scoufos on the afternoon of January 10, 2006 at 3:00 p.m. During that meeting, I was advised that the District Attorney's office was giving its consent to the City of Santa Rosa to pursue a *§17200* cause of action against the defendants in this case.

10.      I had subpoenaed Ms. Richardson and Mr. Savano to trial when the matter was scheduled for October, 2006. There is no prejudice to the defendants as the general facts and the evidence to be presented has not changed since the latter part of September 2006. Defendants would have faced the same testimony as I had the two managers under subpoena back in October, 2006.

11.      We requested the District Attorney's consent due to *Business & Professions Code §§ 17204 and 17206*.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 2⊥ day of January, 2007, in Santa Rosa, California.

MICHAEL J. CASEY
Assistant City Attorney
Attorney for Plaintiff
City of Santa Rosa

Declaration of Michael J. Casey                    3

**EXHIBIT A**

SUPERIOR COURT OF CALIFORNIA
FOR THE COUNTY OF SONOMA
(Unlimited Civil Case)
Case No. SCV-237677

# CITY OF SANTA ROSA

## vs.

RAMAN D. PATEL, individually
and as trustee of the Raman D.
and Jashu R. Patel Family Trust,
Raman D. and Jashu R. Patel Residual Trust
and Raman D. and Jashu R. Patel Survivor's Trust,
JAS 4 RAY PROPERTIES L.P., RITA PATEL,
DAVID STAFFORD, PRITA PATEL and DOES 3-20

Condensed Transcript
Deposition of:

KELLIE M. RICHARDSON

Wednesday, September 27, 2006



VINTAGE
REPORTING SERVICES
Certified Shorthand Reporters

411 RUSSELL AVENUE, SANTA ROSA, CALIFORNIA 95403
(707) 575-3534  FAX (707) 940-4147  VINTAGEREPORTING.COM

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SONOMA

---oOo---

CITY OF SANTA ROSA,

    Plaintiff,

vs.              Case No. SCV-237677

                  (Unlimited Civil Case)

RAMAN D. PATEL, individually
and as trustee of the Raman D.
and Jashu R. Patel Family Trust,
Raman D. and Jashu R. Patel
Residual Trust and Raman D. and
Jashu R. Patel Survivor's Trust,
JAS 4 RAY PROPERTIES L.P., RITA
PATEL, DAVID STAFFORD, PRITA
PATEL and DOES 3-20,

    Defendants.

_____/

Deposition of:

KELLIE M. RICHARDSON

Wednesday, September 27, 2006

---oOo---

Reported by:
ROBYN E. CHALK
CSR No. 8131

1

---

The deposition of KELLIE M. RICHARDSON was
taken pursuant to subpoena at the Office of the City
Attorney, City Hall, 100 Santa Rosa Avenue, in the City
of Santa Rosa, County of Sonoma, State of California, on
Wednesday, September 27, 2006, commencing at the hour of
10:00 a.m. thereof, before ROBYN E. CHALK, CSR No. 8131,
a California Certified Shorthand Reporter.

A P P E A R A N C E S

For the Plaintiff
CITY OF SANTA ROSA:

        Office of the City Attorney
        City Hall, Room 8
        100 Santa Rosa Avenue
        Santa Rosa, California 95404

        By:  MICHAEL J. CASEY
            Assistant City Attorney

For the Defendants
RAMAN PATEL, JAS 4 RAY PROPERTIES L.P.,
RITA PATEL, DAVID STAFFORD, and PRITA PATEL:

        Law Office of Frank A. Weiser
        3460 Wilshire Boulevard, Suite 903
        Los Angeles, California 90010

        By:  FRANK A. WEISER
            Attorney at Law

Also present:

    Rita Patel
    David Stafford
    Prita Patel
    Raman Patel

---oOo---

2

---

I N D E X

| Witness:  KELLIE M. RICHARDSON | Page |
|---|---|
| Examination by Mr. Casey | 5 |
| Examination by Mr. Weiser | 94 |
| Further examination by Mr. Casey | 142 |
|  | 155 |
| Further examination by Mr. Weiser | 151 |
|  | 156 |

---oOo---

E X H I B I T S

| Plaintiff's Exhibit No. | Description | Page |
|---|---|---|
| 1 | Protective Order and Grant of Immunity (3 pages) | 5 |
| 2 | Form W-4 (2005) (1 page) | 10 |
| 3 | Photocopy of handwritten list of charges, photocopy of torn business card (2 pages) | 23 |
| 4 | Photocopies of registration cards (12 pages) | 47 |
| 5 | Document entitled "Ilano Motel, Daily Report" (1 page) | 69 |
| 6 | Handwritten list of names (1 page) | 72 |

- continued next page -

3

---

E X H I B I T S (Cont'd)

| Plaintiff's Exhibit No. | Description | Page |
|---|---|---|
| 7 | Handwritten list of names (1 page) | 73 |
| 8 | Photograph (1 page) | 82 |
| 9 | Photograph (1 page) | 82 |
| 10 | Photograph (1 page) | 83 |
| 11 | Photograph (1 page) | 83 |
| 12 | Photograph (1 page) | 83 |
| 13 | Photograph (1 page) | 84 |
| 14 | Photograph (1 page) | 84 |
| 15 | Photograph (1 page) | 84 |
| 16 | Photograph (1 page) | 85 |
| 17 | Photograph (1 page) | 85 |
| 18 | Photograph (1 page) | 86 |
| 19 | Photograph (1 page) | 86 |
| 20 | Photograph (1 page) | 88 |

---oOo---

4

1    KELLIE M. RICHARDSON,
2  being first placed under oath by said Certified
3  Shorthand Reporter, in all respects as required by law,
4  in answer to oral interrogatories propounded by
5  MICHAEL J. CASEY, Attorney at Law, made answer, and
6  proceedings were had as hereinafter set forth:
7        EXAMINATION BY MR. CASEY
8    MR. CASEY: Q.  Would you please state your
9  full name for the record?
10   A.  Kellie Michelle Richardson.
11   Q.  And your date of birth?
12   A.  4/28/73.
13      (Plaintiff's Exhibit 1 was marked
14      for identification by the reporter.)
15   MR. CASEY:  Okay.  I've had marked as Exhibit 1
16  the Protective Order and Grant of Immunity that Judge
17  Owen recently signed in this case.
18      And I want to direct your attention to page 2,
19  and you'll see subpart a) at the top.
20   A.  Mm-hmm.
21   Q.  And part of the court order was that you and
22  Arthur Savano are to answer questions at the deposition.
23      Do you understand that that was part of the
24  immunity order?
25   A.  Yes, I do.

5

1  country.
2    Q.  If at any time during the deposition you feel
3  threatened or intimidated, I want you to mention that --
4    A.  Mm-hmm.
5    Q.  -- as soon as you start feeling that.  Okay?
6    A.  Yeah.  That's fine.
7    Q.  All right.  Did you work at the Llano Motel on
8  2004 Santa Rosa Avenue?
9    A.  Yes, I did.
10   Q.  And what was your job or position at the Llano
11  Motel?
12   A.  I was manager -- or comanager with my father.
13   Q.  And your father's name is?
14   A.  Arthur Savano.
15   Q.  And can you tell me during what period of time
16  you were the manager or the comanager of the Llano
17  Motel?
18   A.  From September -- about September 24th of 2004,
19  when my mom passed away, until it was shut down.
20   Q.  And that was toward the end of --
21   A.  End of --
22   Q.  -- October --
23   A.  Yes.
24   Q.  -- 2005?
25   A.  Yes.

7

1    Q.  Okay.  And I want to direct your attention,
2  too, to the third page, b), that neither you nor
3  Mr. Savano shall be prosecuted or subjected to any
4  penalty on account of anything that you testify to.
5      Do you understand that?
6    A.  Yes, I do.
7    Q.  And I want to direct your attention to
8  subparagraph d), that this Protective Order and Grant of
9  Immunity is effective only if you and Mr. Savano testify
10  fully and truthfully.
11      Do you understand that, too?
12   A.  Yes, I do.
13   Q.  Now, we have the Patel family here in the room.
14  And I want to know if you, in any way, feel threatened
15  or intimidated by their presence --
16   A.  No, I don't, but I'm not very comfortable with
17  them here.
18   Q.  Okay.  At any time --
19   MR. WEISER:  I'm the attorney of record for the
20  Patels in this case, and since they are named
21  defendants, they're entitled to be here.
22   THE WITNESS:  That's fine.
23   MR. WEISER:  I guess I just want to know, Mike,
24  is Ms. Richardson's attorney going to be here today?
25   MR. CASEY:  No.  I understand she's out of the

6

1    Q.  All right.  We're going to need to do a couple
2  things during the deposition.
3    A.  Mm-hmm.
4    Q.  I'll be asking questions.  Mr. Weiser may have
5  some questions for you, also.  Even though you know or
6  anticipate what I'm going to ask, let me complete the
7  question before you answer.  Okay?
8    A.  Okay.
9    Q.  Thanks.  As the manager of the motel, can you
10  describe for me what your general duties and
11  responsibilities were?
12   A.  I was to collect rent, take care of the daily
13  log.  I was to get the rooms clean, 'cause there was no
14  maid, so we had to clean the rooms.  Basically, take
15  care of the whole motel.  We had to do the yardwork.  We
16  did the cleanings.  We did the laundry.  We did the --
17  everything: the front office, answer the phones, rented
18  the rooms, did the -- got the money ready for the Patels
19  to come pick it up every day.
20   Q.  Now, who hired you as the manager of the motel?
21   A.  That's kind of -- you know, it kind of went --
22  it was kind of a weird situation.  My mom passed away,
23  and we ended up staying there for a little bit, and
24  then --
25      (The reporter interrupted.)

8

1    MR. CASEY: Q. Slow down.

2    A. And, basically, we were staying there to --

3    after she had passed away, and it kind of just -- I

4    don't know how it worked, but it just kind of worked

5    that way. They needed somebody. We were there, so I

6    guess it was just kind of a -- I would say Rita. She

7    was the one that was mostly -- the one I talked to.

8    Q. Now, what was your mother's name?

9    A. Marie Grant.

10    Q. And as far as you know, was your mother a

11    manager at the Llano Motel?

12    A. Yes, she was.

13    Q. All right. Roughly, what period of time was

14    she the manager?

15    A. I don't -- I would say maybe a year. From like

16    two thousand -- beginning of 2004 to when she -- I'm not

17    too sure exactly how long it was.

18    Q. So you moved into the motel, and it was

19    sometime after you moved in that you started taking on

20    the duties and --

21    A. Yes.

22    Q. -- responsibilities as a manager?

23    A. Yes.

24    Q. All right. So who was living at the motel with

25    you?

9

1    A. That would be my father, Mike Savano; my

2    husband, Steve Richardson; and my two kids.

3    Q. And what are your two children's names and

4    ages?

5    A. Steven Richardson, who is 13, and Jordan

6    Richardson, who is 9.

7    Q. Now, your dad goes by "Mike Savano"?

8    A. Yes, he does.

9    Q. All right. Is his formal name Arthur Savano?

10    A. Yes.

11    Q. When you first started there in September

12    2004 -- well, first of all, did you fill out any kind of

13    an employment application --

14    A. Yes, I did.

15    Q. -- for the Patel family? And who did you give

16    the employment application to?

17    A. To Rita Patel.

18    Q. And at some time, did you fill out a W-4

19    withholding form?

20    A. Yes, I did.

21    MR. CASEY: May we have this marked, please.

22    (Plaintiff's Exhibit 2 was marked

23    for identification by the reporter.)

24    MR. CASEY: I'll show you what's been marked --

25    MR. WEISER: Can I see a copy of that, please?

10

1    MR. CASEY: Q. Showing you what's been marked

2    Exhibit 2, is that your handwriting?

3    A. Yes, it is.

4    Q. And is that your signature?

5    A. Yes, it is.

6    Q. And is this a W-4 Employee's Withholding

7    Allowance Certificate that you filled out for your

8    employment at the Llano Motel?

9    A. Yes, it is.

10    Q. When you first started working as a manager at

11    the motel, did the motel or the owners employ a maid or

12    a cleaning service to clean the rooms?

13    A. No, they didn't.

14    Q. Who was responsible for cleaning the rooms?

15    A. Me and my father.

16    Q. From the time you started working as a manager

17    till the time that you stopped, roughly at the end of

18    October 2005, can you give me an idea what your daily

19    work consisted of at the motel?

20    A. Well, I had to get up, and if anybody was

21    staying there, we'd have to go and collect rent and then

22    clean the rooms as best we could and get the money ready

23    for the Patels to come pick it up and then just rent

24    rooms daily. I mean, that was just the daily routine.

25    Q. Was there any division of management

11

1    responsibilities between you and your father?

2    A. No. We basically did everything together. I

3    mean, he did whatever. But I usually was behind the

4    desk, and I'm the one that usually counted the money and

5    did the daily sheets and gave those to Rita. I mean, he

6    would check people in once in a while, I mean, you know,

7    if he was there. But I was usually the one that did

8    that.

9    Q. Just generally, what was the procedure or

10    policy for checking guests in at the motel?

11    A. They'd come in, I'd get an ID, and I'd fill the

12    card out and rent them a room. I mean, it was just a

13    basic.

14    Q. When you talk about a card, what kind of card?

15    A. They had a little -- a registry card. You

16    know, they had to have their name, address, and the

17    amount of money that they're paying and the day that

18    they were staying and the room that they were in.

19    Q. And that was filled out for each guest or

20    customer?

21    A. Mm-hmm, yes.

22    Q. Now, did you have a particular person in the

23    Patel family that you reported to or that supervised you

24    and what you were doing at the motel?

25    A. That would be Rita Patel.

12

1    Q. -- of a Llano Motel card?

2    A. Yes, they were.

3    Q. And was that card somehow taped or glued to --

4    A. Yeah. It was taped, I think, to whatever -- I

5    don't even remember what was in the office now.

6    Whatever was next to the phone, it was taped on

7    something next to the phone.

8    Q. So would it be fair to say these were the basic

9    charges --

10    A. Yes.

11    Q. -- during the entire time that you were working

12    there --

13    A. Yes.

14    Q. -- as a manager?

15    A. Yes.

16    Q. Okay. Now, were you aware that prostitutes

17    were renting rooms at the motel?

18    A. Yes.

19    Q. And when did you first become aware that

20    prostitutes were actually renting rooms at the Llano

21    Motel?

22    A. Well, actually, after they started renting the

23    rooms and we realized what they were doing and -- I

24    mean, it was pretty obvious.

25    Q. When was that, in terms of when you first

25

1    started there?

2    A. You know, I don't even know when, what month it

3    would have been. Maybe the end of 2004?

4    Q. And how did you first become aware that they

5    were actually working girls or prostitutes that were

6    renting rooms?

7    A. Well, at first, they -- I guess, you know,

8    they -- I guess, they hid it from us. I mean, we

9    weren't very -- I guess you can call us naive at first.

10    But then after a while, like, the same person

11    keeps renting the room. Then you realize that too many

12    people are going in the room. You realize something's

13    going on. So it was like you kind of just, basically,

14    knew once, you know, they kept renting the room.

15    Q. So at some point in time after the prostitutes

16    were renting rooms, you had a pretty good idea what they

17    were doing?

18    A. Yes.

19    Q. All right. Now, as far as you knew, were they

20    actually conducting their business inside the rooms?

21    A. At first, I didn't think so, but I think yeah.

22    I think they were.

23    Q. What, if anything, did you do when you found

24    out that -- or suspected that the prostitutes were

25    actually doing their business in the rooms?

26

1    A. I believe that we called -- I believe we had

2    conversations with the Patels about it, 'cause, you

3    know, I wasn't too sure on what to do. You know, I've

4    never been a manager of a motel before, never ran a

5    motel, never worked in a motel before, didn't really

6    know what to do.

7    And, you know, I don't even know what the

8    conversation -- kind of conversation we had. But it

9    just came about that they were there, and then it just

10    came about that -- to rent -- to raise the price on

11    them. So we basically had to raise the price on the

12    girls that came in through the motel.

13    Q. Well, do you recall, at any point, actually

14    having a discussion with Rita after you first became

15    aware that you suspected that the prostitutes were doing

16    their business inside the rooms?

17    A. You know, I'm not too sure of the conversation

18    that we've had, but I mean, there was quite a few, so I

19    don't really recall the first conversation we had about

20    it.

21    Q. Well, after you first -- well, let me ask you

22    this: Did you bring it to the Patel family's

23    attention --

24    A. Oh, yes.

25    Q. -- that you thought prostitution was going on

27

1    in the motel?

2    A. Oh, yes.

3    Q. All right. And --

4    A. I think they were pretty aware of it, too, once

5    they drove through all the time, and, you know, you --

6    it's kind of obvious.

7    Q. And why do you say that?

8    A. Well, after a while, the same girls would keep

9    renting the room, they'd come in, and then they'd start

10    hanging out on the parking lot and just -- it was kind

11    of obvious.

12    Q. And when the prostitutes were hanging out, were

13    they hanging out at times when members of the Patel

14    family would come to the motel?

15    A. I think at first, because they didn't know who

16    the Patels were at first.

17    Q. And then what happened?

18    A. And then they would hide when the Patels would

19    come, 'cause they, basically, knew who the Patels were,

20    and they have spoken to a few of the Patels, so ...

21    Q. Why would you think, then, that if members of

22    the Patel family came to the motel, they would know if

23    the girls were prostitutes or not?

24    A. Why would I know that they would know --

25    Q. Yeah. Why would you think that?

28

1    A.  Well, because, basically, they -- you know,
2  she -- basically, every night, I talked to Rita on the
3  phone. Every day, every night, we basically had a
4  conversation about who was at the motel, and if -- you
5  know, and then it came about --
6        (The reporter interrupted.)
7        THE WITNESS:  -- if there was any girls at the
8  motel, I'd let her know.
9        MR. CASEY:  Q.  When you say "girls," what are
10  you referring to?
11    A.  I'm referring to the prostitutes.
12    Q.  So you had conversations on the telephone with
13  Rita where you would let her know that there were
14  prostitutes at the motel?
15    A.  Yes.
16    Q.  What, if anything, did she say about that?
17    A.  Basically, it was just to make sure they were
18  quiet and didn't cause any problems.
19    Q.  At some point in time, did you get instructions
20  or directions from the Patel family to increase the room
21  rates if the people renting were prostitutes or pimps?
22    A.  Yes.
23    Q.  And when were you first told to do that?
24    A.  God. It was when -- I don't remember the time
25  or month, but it was soon after that the girls were --

29

1  started being there -- the prostitutes were there.
2    Q.  And who specifically gave you that direction to
3  increase the rates for the pimps or the prostitutes?
4    A.  Rita.
5    Q.  Did you have conversations at any time with any
6  Santa Rosa police officers about the prostitution that
7  was taking place at the motel?
8    A.  Yes, I did.
9    Q.  About how many times?
10    A.  Oh, quite a few times.
11    Q.  What was --
12    A.  I asked them quite a few times myself about
13  what was going on and if I could get in trouble for that
14  and ...
15    Q.  And what were you told?
16    A.  I was told that I couldn't be the one getting
17  in trouble, that the owners would, and that, you know,
18  it needs to stop, this and this and that. So I relayed
19  the message back to Rita.
20    Q.  And what did Rita say?
21    A.  Well, I believe at first, when that happened, I
22  believe that her dad had -- I believe it was around
23  Christmas, maybe, that her dad had kicked everybody out
24  because of that.
25    Q.  What do you mean her dad had kicked --

30

1    A.  I believe that when all this started happening
2  and I'd had conversations with the officers, I believe
3  that when we had talked with Rita about it, I believe
4  that her dad had kicked everybody out of the motel for a
5  couple weeks because of the prostitution and stuff and
6  didn't want to get in trouble. But then I believe that
7  Rita --
8        (The reporter interrupted.)
9        THE WITNESS:  Well, I believe that after we had
10  talked about the prostitutes being there, I believe that
11  Rita and Raman and them decided that they didn't want
12  anybody there to get in any trouble, so everybody was
13  kicked out.
14        MR. CASEY:  Q.  Okay.  So let's stop and take
15  it a step at a time.
16        How were the people kicked out?
17    A.  They were told to -- they had to, basically,
18  leave that day, the day that they found out that things
19  were going on, they didn't want any more trouble, the
20  people -- anybody and everybody that was at the motel
21  had to leave that day.
22    Q.  When was that?
23    A.  God. I can't -- I don't know if it was just
24  right after Christmas or just before Christmas of 2004.
25    Q.  So was the motel cleared and remained empty for

31

1  about two weeks?
2    A.  Yes.
3    Q.  And what was your understanding as to why the
4  motel was kept empty for that period of time?
5    A.  Because nobody rented rooms there except pretty
6  much the homeless people and the prostitutes and -- I
7  mean, you know, that was about it.
8    Q.  No. I'm asking the question --
9    A.  Oh.
10    Q.  Let me withdraw that question.
11        What was your understanding as to why,
12  essentially, the motel was not being rented during those
13  two weeks or so?
14    A.  Because I -- my understanding was they didn't
15  want any trouble with the police with the prostitutes so
16  they kicked everybody out.
17    Q.  So what happened after that two-week period
18  went by?
19    A.  I believe that since nobody was renting rooms,
20  they weren't getting any money from the rooms, so I
21  believe that Rita went ahead and said it was okay to
22  rent to the prostitutes.
23    Q.  Well, at some point, did you begin renting
24  rooms out after the two weeks or so that the motel was
25  cleared?

32

1    A. Yeah.
2    Q. All right. And after that, did you have any
3 specific conversations with anyone in the Patel family
4 about whether or not you should rent rooms if you
5 suspected that the guest was a prostitute or a pimp?
6    A. Yeah. I could rent to them. I just had to --
7 basically, if I didn't know if they were a prostitute, I
8 was told to, basically, ask them if they were a
9 prostitute.
10    Q. And who told you to do that?
11    A. Rita Patel.
12    Q. What other instructions were you given about
13 that?
14    A. If it was a prostitute, I had to raise the
15 price. The price had to be a different price, because
16 she had a different price set.
17    Q. And what, if anything, were you told about
18 renting to pimps?
19    A. I don't think I ever really was told anything
20 about pimps. It was ...
21    Q. All right. Do you recall having any
22 conversations with anyone in the Patel family about the
23 contact and the conversations that you were having with
24 the police department?
25    A. Say that again? I'm sorry?

33

1    Q. Yeah. Did you ever tell anyone, whether it be
2 Rita, David, or Mr. Patel, that you had been contacted
3 by the police and the police knew about the prostitution
4 at the motel?
5    A. Yeah. I've had conversations with Rita Patel.
6    Q. And what, if anything, did Rita say in response
7 to your telling her that the police knew what was going
8 on?
9    A. Basically -- oh, God. I don't know. Let's
10 see. When I told her about that, basically, she said
11 that, you know, to -- if the girls were staying there,
12 the prostitutes, then I was to, basically, kind of hide
13 them from the police, and there was like a curfew of
14 9 o'clock that they couldn't be outside.
15    Q. Did she ever tell you, "I don't want
16 prostitutes in the motel. Do not rent to anyone that
17 you think or you suspect is a prostitute"?
18    A. No.
19    Q. All right. So she told you to hide them from
20 the police?
21    A. Basically, yeah.
22    Q. And what was this curfew?
23    A. Curfew was that they didn't want anybody in the
24 parking lot after 9 o'clock.
25    Q. What was going on in the parking lot up until

34

1 that point in time?
2    A. Well, sometimes -- I mean, I couldn't be out
3 there every minute of the day, but sometimes the girls
4 would be -- the prostitutes would walk back and forth in
5 the parking lot.
6    Q. Can you describe for me generally how the
7 prostitutes were dressed?
8    A. At first, they were wearing very skimpy little
9 skirts and shorts and high heels and really skimpy
10 outfits.
11    Q. Did they change their manner of dress at some
12 point?
13    A. Yes, they did.
14    Q. When?
15    A. Throughout -- I'm not sure exactly what period
16 of time, but it was basically told that Rita didn't want
17 them dressing like that at the motel. They had to wear
18 pants, no short skirts, or anything like that. So,
19 basically, it was like a dress code.
20    Q. You said that Rita --
21    A. Yes.
22    Q. -- had told -- what? Told you?
23    A. Told me, yes.
24    Q. What did she say in that regard?
25    A. That she didn't want -- that if they were going

35

1 to be there, she didn't want them wearing the skimpy
2 outfits.
3    Q. When did Rita tell you that?
4    A. I don't know the approximate time or when.
5 It's just throughout our conversations.
6    Q. Did you communicate that to the girls at the
7 motel?
8    A. Yes, I did.
9    Q. Did they comply with that?
10    A. Pretty much, yeah. Every once in a while,
11 somebody wouldn't, and I'd have to go out there and tell
12 them.
13    Q. Did you ever see Rita talking to any of the
14 prostitutes at the motel?
15    A. She's talked to a couple of them a few times.
16 You know, they got to know who the owners were, so
17 they'd try to say "hi" and stuff like that.
18    Q. Do you know the names of any of the prostitutes
19 that you saw Rita speaking to?
20    A. No, I don't.
21    Q. Did you overhear any of the conversation
22 between Rita and the prostitutes?
23    A. Yeah. A couple of times, we'd both -- like
24 if -- she'd walk down there. Like, say she thought
25 there's too many people in a room when she'd go drive

36

1　Q.　Were you aware of any of the prostitutes
2　getting beat up on the premises while they stayed at the
3　Llano?
4　　A.　Getting beat up.　No.　I don't think they ever
5　got beat up, but there was a couple incidents with
6　somebody coming into their room and they were trying to
7　get them out of their room.　That was like the biggest
8　incidents, I think.　I don't think --
9　Q.　What do you mean?
10　　A.　Like, a couple of times, my husband, Steve,
11　would have to go out there because there would be an
12　argument or something.　You could hear something.　You'd
13　go out there and check on the parking lot.　And maybe
14　there was somebody going into a room and the girl didn't
15　want him in the room, and that'd be an argument.　And
16　he'd, you know, go and help that situation out.
17　Q.　Were you aware of any property crimes or theft
18　offenses that involved the prostitutes when they were
19　staying at the motel?
20　　A.　No.　But I believe that -- sometimes a Mexican
21　guy would come up to us and say something to us about --
22　you know, I couldn't understand him.　But, basically, I
23　believe -- yeah.　I think the girls might have stole
24　from them, maybe.
25　Q.　What led you to that conclusion?

41

1　　A.　Just the way that -- you know, I couldn't
2　understand everything the guy would say, but, you know,
3　you kind of get the picture when he's pointing at the
4　girl and he's saying something and he wants something
5　like his money or something.　You kind of figure that
6　it's, most likely, the girl's stealing from him.
7　Q.　How many times do you recall that happening?
8　　A.　Maybe a couple times.
9　Q.　Did you ever have any of the employees of the
10　businesses next door come over and complain to you about
11　the girls working on the property?
12　　A.　I believe yeah.　I believe the guy next door to
13　us complained and basically told us that he was going to
14　take them to court for the prostitution going on in
15　front of his business.
16　Q.　What business was that?
17　　A.　It's the stereo shop -- I can't remember the
18　name -- right next door to the motel.
19　Q.　And who was the person that came over and spoke
20　to you?
21　　A.　It was a bigger guy.　I'm not sure of his name.
22　I think he might have been the owner.
23　Q.　Did he have dark hair?
24　　A.　Yeah, kind of big mustache, wore like -- always
25　wore a funky hat.　I don't remember his name.

42

1　Q.　Kind of heavyset?
2　　A.　Yeah.
3　Q.　Do you remember if his name was Mike?
4　　A.　Yeah.　I think it might have been.　He was the
5　owner of the stereo shop.
6　Q.　On any other occasions, did any other employees
7　or people connected to the businesses next door come
8　over and complain to you about the prostitution?
9　　A.　Not to me.　I think they complained to Rita,
10　but not to me.
11　Q.　Did you ever see any of the people from the
12　businesses next door complaining to Rita?
13　　A.　No, I don't think so.　But I know that they
14　used to go over there, and I think that Rita's gone over
15　there and talked to them a couple times.　I don't know
16　if she had some business to do with them or something,
17　but ...
18　Q.　Now, there are various farmworkers that stayed
19　at the motel; is that right?
20　　A.　Yes.
21　Q.　All right.　Did any of the farmworkers ever
22　come up to you or your dad and complain about the
23　prostitutes or the prostitution that was taking place?
24　　A.　Never.　Except I think the -- the guys that
25　came and stayed there themselves, they never complained

43

1　about anything.　I believe that it was -- I think his
2　name's Steve.
3　Q.　Did he run one of the work crews?
4　　A.　Yes, he did.
5　Q.　Did you ever have any conversations with him
6　about the prostitution or what was going on at the
7　motel?
8　　A.　After he stopped staying there, yes.
9　Q.　What did he tell you?
10　　A.　That his guys didn't want to stay there anymore
11　because of the high price of the rooms and too many
12　girls.
13　Q.　Well, when he said "too many girls," did you
14　know what he was talking about?
15　　A.　Well, yeah.　Well, he said, basically, too many
16　prostitutes.
17　Q.　When did you have this conversation with Steve?
18　　A.　I believe it was the -- I don't remember if it
19　was last when they stayed there, but I believe it was
20　after he stayed there and they moved down the street to
21　a different motel.
22　Q.　What, if anything, did you say in response to
23　that?
24　　A.　That, "I'm sorry," that, "I have nothing to do
25　with the room rates, and I can't help who comes and

44

**Page 57**

1  Diamond D being at the motel?
2  A.  Oh, yeah.  They knew who he was.
3  Q.  How do you know that?
4  A.  'Cause he stayed there for so long, and they
5  kept raising the rent on him, and he kept having a
6  problem of why they kept raising the rent on him every
7  couple weeks.
8  Q.  Well, how do you know that he had a problem
9  with them raising the rent?  Would he talk to you?
10  A.  Because they -- they would tell me, "Oh, his
11  rent's got to go up," so I'd have to go down, tell him,
12  "Hey, your rent has to go up today."  And then I'd relay
13  the message back to them about him not being upset --
14  being upset about it and then wanting to talk to them.
15        And I'm not sure.  I think he did have a couple
16  conversations with them.
17  Q.  Do you know why Rita and David were asking you
18  to raise his rent?
19  A.  Because he stayed there for so long, and he had
20  a girl in the room, and it was two people in a room, and
21  so they just kept raising the rent.
22  Q.  Well, were they being charged a weekly rate or
23  a daily rate?
24  A.  A daily rate.
25  Q.  The second card on page 28, Braghette Price, do

57

**Page 58**

1  you know who she is?
2  A.  Yes.  I recognize that name.
3  Q.  And who is Braghette?
4  A.  Prostitute.
5  Q.  She was charged $119.90 in mid-March?
6  A.  Yes.
7  Q.  Okay.  Page 29, top card is Waldonneke Taylor.
8  Do you recognize that name?
9  A.  Yes, I do.
10  Q.  And who is that?
11  A.  Prostitute.
12  Q.  And she stayed there April 16th?
13  A.  That's what it says.  Yes.
14  Q.  And she was charged $119?
15  A.  Yes.
16  Q.  Now, in April of 2005, were regular guests
17  charged $119 a night to stay there?
18  A.  No.
19  Q.  All right.  The bottom card on page 29 is
20  Nicole Davis?
21  A.  That would be Nicole, Diamond's girlfriend.
22  Q.  And she was charged $98 on March 13th?
23  A.  Wait.  No, no.  That's -- I'm sorry.  That's
24  not his girlfriend.  That's a different Nicole that
25  stayed there.  I'm sorry.

58

**Page 59**

1  Q.  Okay.  But this Nicole Davis, she was charged
2  $98?
3  A.  Yes, she was.
4  Q.  All right.  Does that indicate to you that she
5  was a prostitute?
6  A.  I believe -- what room was she in?  14?  I
7  believe that she was suspected of being one so they
8  charged her that.
9  Q.  Now, it says on her card, Nicole's card, there
10  was one adult and one minor?
11  A.  It was a child, and she was, like, her sister.
12  Q.  How old was the minor?
13  A.  But she -- her -- I think she was 14.  It was
14  her sister.  14?  I don't know.  14?  16?
15  Q.  Was the minor working as a prostitute?
16  A.  No, no.  The minor went to school, I think, if
17  I believe.
18  Q.  The next one is 100, of this exhibit, and the
19  card is for Tracy Ann Martinez.  Do you know her?
20  A.  Yes, I do.
21  Q.  And who was she?
22  A.  She and her boyfriend were staying at the
23  motel, living there, and they lived there for quite some
24  time, too, and she was a prostitute.
25  Q.  What was her boyfriend's name?

59

**Page 60**

1  A.  Jeff.
2  Q.  Now, when you say "boyfriend," was he --
3  A.  It was her --
4  Q.  -- was he the pimp for her?
5  A.  No.  They were actually boyfriend-girlfriend.
6  Q.  So she was charged $119 a day in June, and the
7  side of the card indicates that she was there for
8  almost -- a little over three weeks; is that right?
9  A.  Yes.
10  Q.  And she was charged $119 a day?
11  A.  A day.
12  Q.  How come she wasn't charged the weekly rate?
13  A.  Because she was a prostitute, so they charged
14  her -- it was daily.
15  Q.  Okay.  Then we have page 101.  It's a
16  registration card for the same girl, Tracy Martinez,
17  between August and September?
18  A.  Mm-hmm.
19  Q.  Is that right?
20  A.  Yes.
21  Q.  She was charged $119.90 a day?
22  A.  Yes.
23  Q.  Do you know Rachel Sneed?
24  A.  Yes.
25  Q.  And who is Rachel?

60

1    A. She's a prostitute.
2    Q. All right. We see her name on a registration
3 card on page 103. And in August, she was charged $119 a
4 day?
5    A. Yes.
6    Q. And it appears that she stayed there just over
7 three weeks?
8    A. Mm-hmm.
9    Q. Is that right?
10   A. Yes, yes.
11   Q. And she was charged that daily rate the entire
12 time she was there?
13   A. Until -- it shows you another date right here
14 (indicating)? Her room rate went up.
15   Q. So it appears that on September 9th, her rate
16 was raised to $150?
17   A. Yes.
18   Q. Why was her rate raised to $150 in September?
19   A. That would be because Rita raised the rent.
20   Q. Okay. So Rita told you to raise the rates for
21 the prostitutes around September 9th?
22   A. I believe so, yes.
23   Q. To $150?
24   A. It was a hundred and -- yeah. That came with
25 the tax and everything, so it was $150.42.

61

1    Q. All right. Now, did you have situations where
2 there would be more than one prostitute that would rent
3 a room together?
4    A. Yes.
5    Q. Now, if you had two or more prostitutes renting
6 a room at the Llano Motel, would they get a break in the
7 daily rate?
8    A. No.
9    Q. I notice the regular customers, they would be
10 charged $54 a night, and then if they had two, there was
11 a $10 increase to about $65 a night.
12   A. Yes.
13   Q. So how were multiple prostitutes charged if
14 they were --
15   A. They were charged -- oh, I'm sorry.
16   Q. -- when they were staying in the same room?
17   A. They were charged the same amount for one
18 person. If they were getting like -- it'd be -- if it
19 was $150.42 for one girl, the next girl would pay
20 $150.42, even though they were staying in the same room.
21   Q. And if there were three girls staying in the
22 same room, all three would have to pay the same daily
23 rate?
24   A. Yes.
25   Q. So page 105 is Kristin Hendricks. Do you know

62

1 her?
2    A. Yeah, I believe so.
3    Q. And is she a prostitute?
4    A. Yes.
5    Q. Looks like on August 3, she stayed there for a
6 number of days, also; is that correct?
7    A. Yes.
8    Q. And she was charged $125 a night?
9    A. Yes, until that date (indicating), and then her
10 room rent went up.
11   Q. So then on September 9th, you had to raise her
12 rate to $150?
13   A. Mm-hmm, yes.
14   Q. Now, I see on the back of page 105, we have
15 some handwritten dates from 9/13 to 9/28. Do you
16 recognize that handwriting?
17   A. Yes.
18   Q. Whose handwriting is it?
19   A. That's mine.
20   Q. Does this indicate that you wrote those dates
21 and the price, $150.42, on the back of the registration
22 card?
23   A. Yes.
24   Q. Why did you do that?
25   A. Just to make sure that -- you know, I tried to

63

1 do it all the time, but I always forgot, but I'd do it
2 just so that that's the date, that's how much they paid,
3 just as a record on there, on the card.
4    Q. Did you also keep any kind of notes yourself at
5 any period of time as to --
6    A. Yeah, I did.
7    Q. -- what the customers or guests were paying?
8    A. Yes, I did.
9    Q. Why?
10   A. Just because -- I don't know. 'Cause we'd
11 always have conflicts about who was in the room and how
12 much money that was charged for each room, so I kept my
13 own little log, which, when they came to the office that
14 night, they took it. The police took it.
15   Q. Did you keep track in any kind of a notebook,
16 or were these loose-leaf papers?
17   A. It was in the notebook.
18   Q. What color was the cover of the notebook?
19   A. I believe it was purple.
20   Q. Was there more than one notebook?
21   A. I had a couple notebooks, so I don't know
22 exactly what the other color was. But yeah. I had a
23 couple notebooks up there.
24   Q. Okay. And the police picked up both those
25 notebooks?

64

**Page 65**

1    A.  Yes, they did.

2    Q.  Showing you page 110, we have two registration

3  cards.  The top one is -- looks like Angelique Guerrero,

4  and the bottom one is Kevin Bianchi.

5    A.  Mm-hmm.

6    Q.  Both on September 6th, and they were each

7  charged -- what? -- the normal room rate at that time,

8  $54.50?

9    A.  Yes.

10    Q.  Page 116 shows, the top card, Courtney Proehl?

11    A.  I don't know how to say it, but yeah.

12    Q.  Do you know her?

13    A.  Yes, I know her.

14    Q.  Who's she?

15    A.  She's a prostitute.

16    Q.  And then the card underneath is for Jannet

17  Becerra, and you mentioned before she's a prostitute,

18  too?

19    A.  Yes.

20    Q.  Page 117 of Exhibit 4, Brandy Green, do you

21  know Brandy Green?

22    A.  Yes.

23    Q.  And who is Brandy Green?

24    A.  Prostitute.

25    Q.  This card indicates she stayed there

**Page 66**

1  September 16th to September 18th?

2    A.  Yes.

3    Q.  All right.  Page 150, Miesha Williams is on

4  both cards there.  Do you know Miesha?

5    A.  Prostitute.

6    Q.  How do you know that?

7    A.  The price, $150.42.

8    Q.  Page 163 has two cards.  Top card is Jennifer

9  Longhorn.  Do you know her?

10    A.  I don't recall her, but, obviously, she's a

11  prostitute.

12    Q.  Why do you say that?

13    A.  The price, $150.42.

14    Q.  The bottom card has a name, Devin Ruppenstein?

15  Do you know her?

16    A.  I know who she is.

17    Q.  Who is Devin Ruppenstein?

18    A.  Prostitute.

19    Q.  Did Devin work with any other girls, or did she

20  work by herself, or do you know?

21    A.  I don't know.  I think they were all friends,

22  so they all kind of --

23    Q.  Why do you say that?

24    A.  'Cause they all would bunch up together in a

25  room and talk and hang out.

**Page 67**

1    Q.  Now, the addresses that I have been seeing with

2  some of these girls on these cards, they're from areas

3  outside of Santa Rosa.

4    Did you ever hear from the girls as to why they

5  were coming from out of the area to the Llano Motel?

6    A.  Because it was supposably on the Internet that

7  it was okay to rent rooms at the Llano Motel and

8  prostitute there.

9    Q.  That's what you heard from the prostitutes?

10    A.  Yes.

11    Q.  How many different prostitutes told you that

12  the Llano Motel was on the Internet?

13    A.  Quite a few.  Like three, four, five.

14    Q.  And was it your impression, based on what they

15  were telling you, that somewhere on the Internet the

16  word was getting out that -- what? -- the motel was a

17  good place for prostitutes to work?

18    A.  Yeah.  I also heard it from an officer, too.

19  He came up and told me about it.

20    Q.  Did you ever mention that to Rita or David,

21  that the girls had told you that the Llano Motel was

22  being spoken about on the Internet --

23    A.  Yes.

24    Q.  -- as a good place for prostitution?

25    A.  Yes.

**Page 68**

1    Q.  And what did they say, if anything, in

2  response?

3    A.  I believe that they wanted to find out what

4  website it was on and to go look and see.

5    Q.  Do you remember them saying anything else?

6    A.  No.

7    Q.  Page 172 of Exhibit 4, the top card has a name,

8  Nicole Bright.  Do you recognize that name?

9    A.  I think so, but I believe she's a prostitute.

10    Q.  And the name on the card underneath is Ashley

11  Atwell.  Do you recognize that name?

12    A.  Yes, I do.

13    Q.  And who is Ashley?

14    A.  A prostitute.

15    Q.  The last page in this group exhibit, page 175,

16  the top card has Diane Marie Adams, I believe.  Do you

17  see that?

18    A.  Yes, I do.

19    Q.  Did you know Diane?

20    A.  Do I know Diane Marie --

21    Q.  Or recognize her name?

22    A.  I'm trying to think of who she is.  I believe I

23  know who she is.  Prostitute.

24    Q.  So this card indicates that she stayed at the

25  motel in October?

1    Q.  Okay.  And how many conversations did you have
2  with Prita?
3    A.  Probably be a handful.  Not much.
4    Q.  How did those conversations come up with Prita?
5    A.  Well, when I wasn't able to talk to Rita or
6  David, 'cause they were the ones I had always to go to,
7  then Rita -- or Prita would call me and check on the
8  motel, and then I'd tell her who was there and how many
9  girls were at the motel.
10    Q.  So how would the subject of prostitution or
11  prostitutes come up in that kind of a conversation?
12    A.  Well, usually she'd call me and check on --
13  "How's the motel?  Is everything okay at the motel?"
14  And I'd say, "Yes."
15        Then she'd ask, "How many people are staying at
16  the motel?" and then I'd tell her.  And I'd tell her --
17  she asked me, "How many are girls?"  And that's
18  basically it.
19    Q.  So your understanding, then, the use of the
20  word "girls" in that context --
21    A.  Prostitutes, yes.
22    Q.  -- meant prostitutes?
23    A.  Yes.
24    Q.  Did you ever have any conversations with Brian
25  Bales?

89

1    A.  Not -- I mean, not really that much.  I mean,
2  he, basically, just would -- he was really quiet, so,
3  basically, he just came, did his thing at the Coke
4  machine.  And every once in a while, he'd come in and
5  get the money and stuff like that.  But other than that,
6  we didn't really have any conversations about -- I mean,
7  we had a couple arguments at one time, but --
8    Q.  What were the arguments about?
9    A.  Oh, that was over my little brother.
10    Q.  Now, you and your dad were -- and I think your
11  husband were arrested the latter part of October of
12  2005; is that right?
13    A.  Yes, we were.
14    Q.  And after your arrest, did you have any
15  meetings or conversations with Rita or David?
16    A.  We had one meeting at a restaurant.
17    Q.  Okay.
18    A.  And that was just my father and me and David
19  and Rita.
20    Q.  What restaurant?
21    A.  I believe it was Marie Callender's.
22    Q.  Do you remember when that meeting took place?
23    A.  I believe it was a day or two after we were
24  arrested.
25    Q.  Okay.  And who asked for the meeting?  Who

90

1  called for the meeting?
2    A.  The Patels.
3    Q.  And how long did you meet with Rita and David?
4    A.  I believe it was a really short meeting,
5  actually.
6    Q.  And what was discussed at the meeting?
7    A.  Just -- they just wanted to know what was said
8  to the police when we got arrested.
9    Q.  And what else was discussed at that meeting?
10    A.  What was taken from the office and -- I think,
11  basically, they were just scared.  They wanted to know
12  what was going on.
13    Q.  Do you remember anything in particular or
14  anything specifically that Rita said during that
15  meeting?
16    A.  No, not in particular.  I mean, it was just all
17  basically about what happened to us at the motel.
18    Q.  Do you remember anything in particular or
19  specific that David said at the meeting?
20    A.  No.
21    Q.  All right.  Did you have any other
22  conversations with any members of the Patel family after
23  your arrest?
24    A.  Not really.  They kept it limited.  They didn't
25  come by the motel anymore.  They didn't call anymore,

91

1  like they used to.  I mean, they used to call me a
2  couple times a day, and then they just kind of basically
3  stopped.
4    Q.  Did you have any telephone conversations with
5  Rita or David after you were arrested?
6    A.  We had a couple conversations, and that was
7  just basically when we were moving out and this and
8  that.  It was really pretty limited.
9    (Raman Patel returned to the deposition room.)
10        MR. CASEY:  Q.  Did you borrow any money from
11  them for any attorneys after the arrest?
12    A.  No -- well, actually, they -- I don't know how
13  we did it, but, basically, they offered to pay for an
14  attorney for us.
15    Q.  And when they offered, was that in response to
16  a request that you, your dad, or your husband made to
17  them?
18    A.  No.  We didn't ask for them to pay for an
19  attorney.  They went ahead and offered to pay for an
20  attorney.
21    Q.  Who was it that offered to pay for the
22  attorney?
23    A.  I believe it was Rita, David, and Raman.
24    Q.  When did they make this offer?
25    A.  After we were arrested and they got their

92

1  Q.  You never got a W-2 form or anything of that
2  sort?
3  A.  No.
4  Q.  Okay.  After you were arrested, when Rita
5  Patel -- or who actually offered to hire your attorney?
6  Was it Rita?
7  A.  I believe so.
8  Q.  And were you on friendly terms with her still
9  at that time?
10  A.  I believe somewhat, yeah.
11  Q.  You were not in a fight with her?
12  A.  No.
13  Q.  And did you take some objection to her offering
14  to hire an attorney for you?
15  A.  No.
16  Q.  Did you take that as a sign she was trying to
17  help you?
18  A.  Yes.
19  Q.  And even though there'd been some issue about,
20  I guess, at one point somebody left the property or the
21  property was unattended, but there had never really been
22  any fights, other than I think your brother and your --
23  that you testified about --
24  A.  Yes.
25  Q.  -- whether they could stay on the property.

141

1  But you yourself personally, there was no fights?
2  A.  I don't think so.
3  Q.  Okay.  Do you know if Rita Patel had any
4  conversation with your attorney or influenced your
5  attorney, as far as defending you?
6  A.  I have no idea.  I don't think so.
7  Q.  And your dad's attorney?
8  A.  I don't know.
9  Q.  So other than just hiring your attorney, you
10  don't know if (inaudible) --
11  (The reporter interrupted.)
12  MR. WEISER:  Q. -- they were influencing the
13  attorney?
14  A.  I have no idea.
15  Q.  And as you sit here today, you haven't been
16  charged with any crime; is that correct?
17  A.  As of right now, no.
18  MR. WEISER:  Just a minute off the record.
19  (Recess taken, 12:37 p.m. to 12:40 p.m.)
20  MR. WEISER:  I don't have any further
21  questions, Ms. Richardson.
22  FURTHER EXAMINATION BY MR. CASEY
23  MR. CASEY:  Q.  Ms. Richardson, you mentioned
24  that, in the daily logs, you were not allowed to put the
25  prices down.  Who told you you couldn't put the prices

142

1  down?
2  A.  Rita Patel.
3  Q.  Did she explain to you why you couldn't put the
4  prices down?
5  A.  So the officers couldn't see the price.
6  Q.  Now, you had a conversation that you told to us
7  with Steve, the guy who was running some of the
8  farmworkers, the day labor.
9  A.  Mm-hmm.
10  Q.  Didn't you, in that conversation with him, tell
11  him that Rita was making you rent the rooms to the
12  girls, the working girls?
13  A.  Yeah.  I mean, she -- yeah.  She insisted on
14  renting the rooms to them, so ...
15  Q.  All right.  He apparently told you that he had
16  some concern, when his guys were there, that there were
17  prostitutes at the motel; is that right?
18  A.  Yes.
19  Q.  And he had some concerns that his guys might
20  get in trouble if they hooked up with the prostitutes at
21  the motel.  Right?
22  A.  Yes.
23  Q.  And he wanted you to do something about it; is
24  that right?
25  A.  Well, it was a little late.  He had already

143

1  left the motel.
2  Q.  All right.  But he told you he had some concern
3  because nothing was being done about that.  Right?
4  A.  Yes.
5  Q.  And so you made the comment to him to the
6  effect that you couldn't do anything about it because
7  Rita had instructed you that you had to rent to them.
8  Right?
9  A.  Yes.
10  Q.  Because that, in fact, was the case.  Rita had
11  told you you had to continue renting to the prostitutes;
12  is that right?
13  A.  Yes.
14  Q.  Now, you were shown the various exhibits here
15  that we've marked showing the various girls, and you
16  testified that you thought they were prostitutes.  On
17  Mr. Weiser's examination, you've been straightforward
18  that you never saw these girls in the actual act of
19  prostitution and so you're assuming that they're
20  prostitutes based on, apparently, their looks.
21  You had conversations with a lot of the working
22  girls at the motel during the time that you worked
23  there.  Right?
24  A.  Oh, yeah.
25  Q.  In fact, some of them apparently stayed at the

144

1  motel for days and days on end; is that right?

2    A. Yes.

3    Q. So it would not be unusual for you, as you were

4  outside either in the parking lot or perhaps cleaning a

5  room next door, that you would run into one of the

6  prostitutes and have a conversation?

7    A. Oh, yeah. That happened all the time.

8    Q. That happened all the time. And in the course

9  of some of those conversations, the girls, in fact,

10  admitted to you, in so many words, that they were

11  working girls and they were prostitutes. Right?

12    A. Yes.

13    Q. Okay. How many of the girls actually admitted

14  to you that --

15    A. Oh, a few.

16    Q. -- they were prostitutes?

17    A. A few of the girls. I don't know how many, but

18  a few.

19    Q. Now, as a manager of the motel, I would find it

20  very surprising if you had actually been in a room at a

21  time when a prostitute was actually engaged in an act of

22  prostitution with a john. Okay? That never happened,

23  did it?

24    A. No.

25    Q. One of your responsibilities was to clean the

145

1  rooms after a guest had left; is that right?

2    A. Yes.

3    Q. All right. So you would have to go into the

4  rooms. And what would the cleaning involve that you

5  would have to do?

6    A. Cleaning the -- redoing the bed and cleaning

7  the bathroom and vacuuming and emptying the garbage.

8    Q. Okay. And when you went into the rooms to

9  clean up after the prostitutes had left, would you see

10  any signs in the room that indicated to you that actual

11  acts of prostitution had taken place in the room?

12    A. Well, sometimes there'd be used condoms in the

13  garbage, quite a few. I mean -- or, you know, I mean,

14  you couldn't for sure, but there'd be wrappers, so you

15  would just -- I mean, I'm assuming.

16    Q. You would see condom wrappers?

17    A. Yes.

18    Q. And there were times where you would see

19  multiple condom wrappers in the room?

20    A. Yes.

21    Q. And there were times where you would also see

22  multiple used condoms strewn about the room; is that

23  right?

24    A. Yes.

25    Q. Some would be in the toilets that had not been

146

1  flushed. Right?

2    A. Yes.

3    Q. Others just laying in the trash can. Right?

4    A. Yes.

5    Q. And on occasion, you would have to dispense of

6  boxes in which packages of condoms actually came --

7    A. Yes.

8    Q. -- do you remember that? Now, on those

9  occasions where you talked to the police, sometimes the

10  police basically told you, "Don't rent to the

11  prostitutes." Right?

12    A. Yeah.

13    Q. But you continued to do so. Right?

14    A. Yes.

15    Q. And that's because Rita and David told you to

16  continue renting to them. Right?

17    A. Well, conversation with Rita.

18    Q. Rita.

19    A. Yeah.

20    Q. And she told you to continue renting to them;

21  is that right?

22    A. She didn't tell me to stop, so --

23    Q. Well, your understanding was that if you did

24  not follow her instruction and continue renting to the

25  girls, that you and your family were probably going to

147

1  be thrown out onto the street; is that right?

2    A. In so many words, yeah.

3    Q. I mean, you had your young children that were

4  living there?

5    A. Yes.

6    Q. You knew that they were being exposed in some

7  way to the girls and the pimps; is that right?

8    A. Yes.

9    Q. That, obviously, had to be --

10    A. It was stressful.

11    Q. -- of concern to you as a mother --

12    A. Yeah.

13    Q. -- right? You didn't want your kids to have to

14  be hanging around these people. Right?

15    A. No, I didn't.

16    Q. So why did you continue doing it, then?

17    A. Because I didn't have anyplace to go, and I

18  didn't have any money, and I didn't have another job,

19  and it was kind of hard to look for another job when you

20  weren't allowed to leave and do anything, so ...

21    Q. Did you actually see any of the girls actually

22  bring men into the room with them after they signed the

23  registration card and rent the room?

24    A. I -- not actually literally right after they've

25  been in the room, but I've seen gentlemen go into their

148

1  rooms.

2      Q.  Guys that you suspected of being johns?

3      A.  Yeah.

4      Q.  All right. And they would go in for relatively

5  short periods of time and then leave?

6      A.  Yes.

7      Q.  And then after they left, you'd see another

8  man --

9      A.  Yes.

10     Q.  -- go into the room, and after a short period

11 of time, he would leave.

12     A.  Yes.

13     Q.  And you would see that frequently at the motel.

14 Right?

15     A.  Yes.

16     Q.  So, generally, what you would see when the

17 prostitutes were renting rooms at the motel, at least

18 the girls that you assumed to be prostitutes, oftentimes

19 you would see multiple men go in and out of those rooms

20 for relatively short periods of time; is that right?

21     A.  Yes.

22     Q.  Now, some of the girls had been coming to the

23 motel -- the working girls -- had been coming to the

24 motel over a period of time in 2005, and they gradually

25 had the rates increased for them. Right?

149

1      A.  Yes.

2      Q.  And they knew the rates were being increased.

3  Right?

4      A.  Yes.

5      Q.  So did any of them say, "Why do you guys keep

6  jacking the rates up for me? Why do you keep charging

7  me more when I see these other guests, they continue to

8  pay the same rate?"

9      A.  No. They didn't really have concern.

10     Q.  Not at all?

11     A.  No, not at all.

12     Q.  They just paid?

13     A.  They would just continue to pay it.

14     Q.  Did most of them pay cash?

15     A.  They all paid cash.

16     Q.  Did any of the prostitutes, to your

17 recollection, ever pay with a credit card?

18     A.  No.

19     Q.  Now, regular guests, normal guests --

20     A.  Hardly at all. I mean, it was -- the majority

21 of the time was cash.

22     Q.  Yeah?

23     A.  Might have been a couple credit cards

24 throughout the time, but no.

25     MR. CASEY: Okay. Thanks. That's all I have.

150

1      MR. WEISER: I've got a few more questions.

2  Sorry. This is the give-and-take that the attorneys

3  have in these kind of things. We'll have you out of

4  here soon.

5         FURTHER EXAMINATION BY MR. WEISER

6      MR. WEISER: Q. One thing I want to know,

7  during this time that you were a manager -- you say you

8  were managing with your dad, did the police ever come

9  undercover trying to rent a room?

10     A.  Not that I know.

11     Q.  Saying they'd like to rent a room and they were

12 doing it for prostitution?

13     A.  No.

14     Q.  Never did that?

15     A.  No.

16     Q.  So at no time there was any undercover

17 operation?

18     A.  No.

19     Q.  Is it fair to say you were pretty surprised you

20 were arrested in late October?

21     A.  I was very shocked. Yeah.

22     Q.  You didn't think you had done anything wrong?

23     A.  No.

24     Q.  You didn't think anything was illegal at the

25 motel?

151

1      A.  I didn't think anything was wrong.

2      Q.  Okay. When Mr. Casey asked you about seeing

3  men going into some of the rooms, now, you don't have

4  any personal knowledge that money was exchanged for sex

5  at the --

6      A.  No, I don't.

7      Q.  So it's just an assumption that these men were

8  johns. Correct?

9      A.  Yes.

10     Q.  Okay. No personal knowledge of any facts that

11 you would base that on?

12     A.  No.

13     Q.  When you'd go into a room and you'd clean the

14 room and you'd see condoms there, did you see any

15 evidence that money had been exchanged for sex?

16     A.  No.

17     Q.  Do you know of anything illegal, as far as your

18 understanding that there's anything illegal, about

19 somebody having sex in a motel room with a condom?

20     A.  No. I believe there's no law against that. I

21 mean, I don't know, but I don't see that there is.

22 Yeah.

23     Q.  Okay. So, I mean, you go in, you'd see

24 activity -- you see evidence that there'd been some

25 sexual activity, but you don't know whether it was

152

**EXHIBIT B**

SUPERIOR COURT OF CALIFORNIA
FOR THE COUNTY OF SONOMA
(Unlimited Civil Case)
Case No. SCV-237677

# CITY OF SANTA ROSA

## vs.

RAMAN D. PATEL, individually
and as trustee of the Raman D.
and Jashu R. Patel Family Trust,
Raman D. and Jashu R. Patel Residual Trust
and Raman D. and Jashu R. Patel Survivor's Trust,
JAS 4 RAY PROPERTIES L.P., RITA PATEL,
DAVID STAFFORD, PRITA PATEL and DOES 3-20

Condensed Transcript
Deposition of:

ARTHUR M. SAVANO

Thursday, September 28, 2006



VINTAGE
REPORTING SERVICES
*Certified Shorthand Reporters*

411 RUSSELL AVENUE, SANTA ROSA, CALIFORNIA 95403
(707) 575-3534  FAX (707) 940-4147  VINTAGEREPORTING.COM

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SONOMA

--oOo--

CITY OF SANTA ROSA,

    Plaintiff,

vs.    Case No. SCV-237677

    (Unlimited Civil Case)

RAMAN D. PATEL, individually
and as trustee of the Raman D.
and Jashu R. Patel Family Trust,
Raman D. and Jashu R. Patel
Residual Trust and Raman D. and
Jashu R. Patel Survivor's Trust,
JAS 4 RAY PROPERTIES L.P., RITA
PATEL, DAVID STAFFORD, PRITA
PATEL and DOES 3-20,

    Defendants.

_____/

Deposition of:

ARTHUR M. SAVANO

Thursday, September 28, 2006

--oOo--

Reported by:
ROBYN E. CHALK
CSR No. 8131

1

The deposition of ARTHUR M. SAVANO was taken
pursuant to subpoena at the Office of the City Attorney,
City Hall, 100 Santa Rosa Avenue, in the City of Santa
Rosa, County of Sonoma, State of California, on
Thursday, September 28, 2006, commencing at the hour of
9:28 a.m. thereof, before ROBYN E. CHALK, CSR No. 8131,
a California Certified Shorthand Reporter.

A P P E A R A N C E S

For the Plaintiff
CITY OF SANTA ROSA:

    Office of the City Attorney
    City Hall, Room 8
    100 Santa Rosa Avenue
    Santa Rosa, California 95404

    By:  MICHAEL J. CASEY
        Assistant City Attorney

For the Defendants
RAMAN PATEL, JAS 4 RAY PROPERTIES L.P.,
RITA PATEL, DAVID STAFFORD, and PRITA PATEL:

    (Via speakerphone)
    Law Office of Frank A. Weiser
    3460 Wilshire Boulevard, Suite 903
    Los Angeles, California 90010

    By:  FRANK A. WEISER
        Attorney at Law

For the Deponent:

    JACK B. MONTGOMERY
    Attorney at Law
    411 Russell Avenue
    Santa Rosa, California 95403

Also present:

    Rita Patel
    David Stafford

2

I N D E X

Witness:  ARTHUR M. SAVANO               Page

Examination by Mr. Casey               5

Examination by Mr. Weiser              89

Further examination by Mr. Casey      109

Further examination by Mr. Weiser     111

--oOo--

E X H I B I T S

| Plaintiff's Exhibit No. | Description | Page |
|---|---|---|
| 1 | Protective Order and Grant of Immunity (3 pages) | 5 |
| 2 | Photograph (1 page) | 22 |
| 3 | Photograph (1 page) | 22 |
| 4 | Form W-4 (2005) (1 page) | 23 |
| 5 | Photograph (1 page) | 82 |
| 6 | Photograph (1 page) | 83 |
| 7 | Photograph (1 page) | 84 |
| 8 | Photograph (1 page) | 85 |
| 9 | Photograph (1 page) | 85 |
| 10 | Photograph (1 page) | 86 |

- continued next page -

3

E X H I B I T S (Cont'd)

| Plaintiff's Exhibit No. | Description | Page |
|---|---|---|
| 11 | Photograph (1 page) | 87 |
| 12 | Photograph (1 page) | 87 |
| 13 | Photograph (1 page) | 88 |
| 14 | Photograph (1 page) | 89 |

--oOo--

4

1    ARTHUR M. SAVANO,
2  being first placed under oath by said Certified
3  Shorthand Reporter, in all respects as required by law,
4  in answer to oral interrogatories propounded by
5  MICHAEL J. CASEY, Attorney at Law, made answer, and
6  proceedings were had as hereinafter set forth:
7        EXAMINATION BY MR. CASEY
8    MR. CASEY: Q.  Would you please state your
9  name for the record?
10   A.  Arthur Michael Savano.
11   Q.  And your date of birth?
12   A.  8/21/48.
13   MR. CASEY: I'm going to have marked first in
14 order a copy of the protective order and grant of
15 immunity.
16      (Plaintiff's Exhibit 1 was marked
17      for identification by the reporter.)
18   MR. CASEY: Q.  Mr. Savano, I'm going to show
19 you what's been marked Exhibit 1 to this deposition.
20 It's a protective order and grant of immunity that Judge
21 Owen issued for you and Kellie Richardson on
22 September 19th, 2006.
23      Have you seen this before, or are you aware of
24 it?
25   A.  Yes, I'm aware of it.  I've seen this.

5

1   Q.  All right.  Do you have a basic understanding
2  that part of the order requires that you're to respond
3  to questions during this deposition?
4    A.  Right.
5    Q.  Okay.  And is it also your understanding that
6  you have complete immunity for anything that you testify
7  to in this deposition in accordance with this protective
8  order and immunity order?
9    A.  Right.
10   Q.  Okay.  I also want you to understand, too, that
11 the immunity order also is conditioned on you fully
12 testifying and truthfully testifying.  So I want to make
13 sure you're aware of that.
14   A.  All right.
15   Q.  Okay?
16   A.  Yeah.
17   Q.  All right.  Just a couple of rules for the
18 deposition.  Let me finish each question before you
19 answer.  That way the court reporter can get the entire
20 question down on the record.
21      You'll need to keep your voice up so we can all
22 hear you.  Mr. Weiser, who is representing the Patel
23 family, has joined us on the telephone, so it will
24 probably be easier for him to hear your answers if you
25 keep your voice up.

6

1    A.  Okay.
2    Q.  Some of my questions just may call for you to
3  say "yes" or "no," so give a verbal response as opposed
4  to "uh-huh," "uh-uh," or nodding your head up and down
5  or shaking it side to side.  Okay?
6    A.  Okay.
7    Q.  Were you employed at the Llano Motel on 2400
8  Santa Rosa Avenue?
9    A.  Yes.
10   Q.  And in what capacity or position were you
11 employed at the Llano Motel?
12   A.  As a manager.
13   Q.  During what period of time did you work as a
14 manager at the Llano?
15   A.  The latter part of 2004 through 2005.
16   Q.  What part of 2005?
17   A.  The whole year.
18   Q.  Can you tell me what your general duties and
19 responsibilities were when you were employed at the
20 Llano Motel?
21   A.  Well, just running the motel, to keep it clean,
22 to clean the rooms, working the grounds, rent the rooms,
23 manage the motel, the operation of the motel.
24   Q.  Were those your general duties and
25 responsibilities during the entire time that you worked

7

1  at the Llano Motel?
2    A.  Yes.
3    Q.  Basically, what did you do with respect to
4  cleaning the rooms?
5    A.  Just pretty much the maid work: clean the
6  rooms, change the linens, vacuum the room, take out the
7  trash, clean the bathroom.
8    Q.  Did you also live at the motel?
9    A.  Yes.
10   Q.  When did you first move into the motel to live
11 there?
12   A.  Well, actually, I was staying there earlier in
13 the year.  Let's see.  I was there when Marie was still
14 there and she worked there.  And she became sick, and I
15 came over to kind of assist her, and I was there four
16 months, working -- well, not really working there, but
17 just kind of assisting her.  She was the manager at the
18 time, until she died in ...
19   Q.  And Marie was Marie Grant?
20   A.  Mm-hmm, yes.
21   Q.  And Marie was your wife?
22   A.  Yes.
23   Q.  Or common-law wife?
24   A.  Common-law wife, yes.
25   Q.  And did the relationship that you had with the

8

1   Q.   When did you first become aware that
2   prostitution activity was taking place on the motel
3   property?
4       A.   You know something? I don't really recall how
5   it started. It occurred probably because someone would
6   rent a room and sometimes it would be a man renting for
7   someone else.
8       I mean, we -- you know, or it would be a woman
9   and then it -- you know, we would realize that, Hey,
10  something's going on. Looks like there's some kind
11  of -- you know, you would recognize it when you saw it,
12  traffic going from that room, and you might see a number
13  of men going into that room.
14      But I can't really recall how -- 'cause it
15  wasn't occurring at the time when Marie was there, so it
16  happened -- started happening afterwards, 'cause I
17  remember Marie, when she was there -- she knew some of
18  the girls that were prostitutes that probably had tried
19  to stay there before. And when she -- she knew them on
20  sight --
21      MR. WEISER: Could you do me a favor, Art?
22  Could you just speak up a little bit?
23      THE WITNESS: Yes, I will.
24      And she would chase them out. She would yell
25  at them, "You don't come in here. You can't be on these

25

1   grounds," dot, dot, dot. So how it started occurring, I
2   can't really remember. It wasn't like, "Let's just
3   start renting to prostitutes." It kind of was a gradual
4   thing. One came and then two.
5       MR. CASEY: Q. Well, what were the signs, or
6   what did you notice that indicated to you that
7   prostitution activity was taking place at the motel?
8       A.   Well, sometimes the young woman might rent a
9   room and be dressed in a particular fashion, you know,
10  not to suggest that she was a prostitute, you couldn't
11  tell, would go into a room and then would appear in hot
12  pants or high heels, and then you would say, "Looks like
13  a prostitute."
14      Q.   All right. What else was an indication that
15  there was prostitution activity taking place at the
16  motel, other than the dress, that you observed?
17      A.   Coming and goings from the room, men. You
18  would see someone go into a room and leave, somebody
19  else. I mean ...
20      Sometimes -- sometimes the girls would dress,
21  and they would walk out into the street. That occurred,
22  too, where they would walk -- just -- they would walk
23  the -- what do they call -- they had a word for it they
24  would do. I don't know what they called it, "the track"
25  or something? They would go out in the street and walk

26

1   up and down Santa Rosa Avenue.
2       Q.   Did you ever observe those girls -- I'll call
3   them the "streetwalkers" -- walk the street and then
4   come back to the rooms with men?
5       A.   Yes.
6       Q.   And how often did you see that occur at the
7   motel?
8       A.   Rather frequently. Many times -- what would
9   happen, is they would leave the grounds, go out onto the
10  street, and you would actually see them come back in a
11  vehicle. You would see the girl and a guy in a vehicle.
12  So I'm assuming they were out in the street, flagged
13  somebody down, came back in a vehicle.
14      Q.   And would you see the woman and the man she
15  came back with in the vehicle then go into a room?
16      A.   Yes.
17      Q.   And then a short while later, that man would
18  leave and get in his vehicle and take off?
19      A.   Yes. Sometimes it would be a very short period
20  of time, ten minutes.
21      Q.   How often did you see that occur at the motel?
22      A.   Well, there was times when I saw it quite a
23  bit.
24      Q.   All right. Did you also observe other
25  situations where the girls that you thought were

27

1   prostitutes that were renting rooms would see vehicles
2   come into the parking lot and would approach the
3   vehicle?
4       A.   Yes, I did.
5       Q.   And after a conversation at the driver's door
6   or perhaps the passenger's door between the girl and
7   whoever was in there, you'd see the car get parked and
8   the man get out and go into the room?
9       A.   Yes, I've seen that.
10      Q.   How often did you see that occur at the motel?
11      A.   That occurred quite a bit.
12      Q.   Did any of the girls that you thought were
13  prostitutes -- did they ever actually admit to you or
14  say anything to you indicating that they, in fact, were
15  prostitutes or that they were working girls?
16      A.   I've heard conversations with them speaking
17  with other girls.
18      Q.   And what did you hear in those conversations?
19      A.   Oh, just about, "I had this guy yesterday,
20  this" -- you know, and, "He wouldn't" -- you know, "He
21  wouldn't give me any" -- "the money," or something to
22  that effect, or, "I had a problem with him. I couldn't
23  get him to leave the room," things of that nature. Just
24  conversations about the business, so to speak.
25      Q.   All right. Do you remember any other

28

1  conversations that you overheard between the girls
2  indicating that they were prostitutes?
3     A.  Yeah.  I've heard them speak about their pimps
4  or whatever, call -- you know, things that -- it was
5  just -- it's like shoptalk.
6     Q.  For example, what would you hear when they were
7  doing shoptalk?
8     A.  Well, we've had some girls come back that were
9  beat up, that you saw them one day, and the next day you
10 saw them and they were injured.  And they discussed it.
11 They talked about it.
12    Q.  And did they say how they got beat up or hurt?
13    A.  Yes.  They said that whoever it was, their
14 pimps -- I can't remember the names -- but, you know,
15 had beaten them up for whatever particular reason.  I
16 don't know what.
17    Q.  So you heard conversations by some of the
18 prostitutes that you observed to be physically injured
19 where they actually said that they were beat up by their
20 pimp?
21    A.  Yes.
22    Q.  Approximately how many times did you hear that
23 kind of conversation?
24    A.  That probably happened maybe a half-dozen times
25 I heard conversations of that nature.  I've heard

29

1  conversations where they talked about leaving, trying to
2  get away.
3        I mean, I knew some of the girls spoke about
4  how they'd like to get out of this type of thing but
5  were afraid to because certain -- their pimps or daddies
6  or whatever it is they called them would -- might
7  threaten their family, knew where they lived.
8        We had a couple of occasions where girls
9  actually tried to and then, you know, came back beat-up
10 because it didn't work out.  I mean, you know, things of
11 that nature.
12    Q.  All right.  When you heard these conversations
13 where the girls were talking about getting beat-up by
14 the pimps or threatened by the pimps, did you hear these
15 conversations on the motel premises?
16    A.  Yes.
17    Q.  And these were girls that were actually renting
18 rooms at the motel?
19    A.  Yes.
20    Q.  Did you ever hear any of the working girls or
21 the prostitutes ever have a conversation where they said
22 they had been raped while they were working at the
23 motel?
24    A.  Let's see.  Not -- well, I remember hearing --
25 there were problems sometimes about collecting money.

30

1  Sometimes guys would do their business, and then,
2  apparently, there was some agreed-upon amount of money
3  exchanged, and then they -- some of these guys didn't
4  feel they got their money's worth and weren't going to
5  pay.
6        And sometimes there was arguments of that
7  nature, you know, fights, kind of, between the girl
8  and -- which would cause a disturbance, which you'd have
9  to go down and mediate, so to speak.
10    Q.  About how many times did you have to go down
11 and mediate a dispute or argument between a prostitute
12 and a john?
13    A.  Personally?  Myself?
14    Q.  Yeah.
15    A.  Oh, I don't know.  Probably half-dozen times.
16 One time I actually got into a physical altercation with
17 a guy because there was a little bit of violence going
18 on.
19        And I came to the door 'cause I heard
20 screaming.  And he was naked in the bed, and he got up
21 and came towards me at the door, and he got to me, and I
22 kind of punched him with my fist on his chest and pushed
23 him back.
24        And we had to throw him out.  In fact, Kellie's
25 husband, Steve, he came down, and we wrestled the guy to

31

1  the ground.  We drug him out towards the street, threw
2  him off the property.  And a police car came by at that
3  time and saw us, and they took it from there.
4        Things of that nature occurred.  There were
5  times when some of these guys would have a problem and
6  felt that they got ripped off.  And a number of them
7  came back and broke windows, threw something through a
8  window.
9     Q.  And how many times did that happen, where a
10 john felt that he got ripped off and came back and broke
11 a window?
12    A.  That -- well, I think a couple of windows were
13 broken.  It didn't happen that much, but I recall a
14 couple of windows that were broken because they were
15 angry about the situation.  They didn't get their
16 money's worth or something went wrong there and they
17 were angry.  Yeah.
18    Q.  Were you ever made aware of any situations at
19 the motel while you worked there where a john claimed
20 that he was beat up by one of the prostitutes or a
21 prostitute's pimp?
22    A.  That, I do not recall.
23    Q.  Do you remember any situations at the motel
24 where a john claimed that he was ripped off by one of
25 the prostitutes or the prostitute's pimp?

32

1   A. Oh, yes.

2   Q. How many times or occasions did you hear that
3   claim?

4   A. Oh, I heard that -- I don't know -- maybe five
5   or six times in the course of my time there. I mean, it
6   probably occurred more. But personally myself hearing
7   it and going and dealing with it, probably about that
8   many times.

9   Q. And what did you hear about those situations?

10   A. Basically, it would be the john did not want to
11   pay up to the so-called agreed price of whatever the
12   girl was charging. And, you know, that's when there
13   would be -- the prostitute would be angry, and there
14   would be a screaming thing about, "You owe me," dot,
15   dot, dot. "I don't owe you nothing." And then you
16   would hear it.

17      There was one occasion where a john was
18   physically beating up a girl in a room, choking her.
19   And we just happened to be walking by and heard a
20   scream, muffled scream. We pounded on the door, and we
21   actually had to go in and pull this guy off and -- this
22   girl that he was choking her on the bed, so ...

23   Q. And this was in one of the motel rooms?

24   A. Yes, it was. Actually, it was one of the rooms
25   right close to the office. Otherwise, we might not have

33

1   been aware of that because -- it was either -- I believe
2   it was Room 1 or 2. It was right close to the office.

3      And Kellie and myself were just walking down,
4   you know, towards the office, and we thought we heard
5   something and started pounding on the door and asked to
6   open it up. And, finally, we had to go get the key to
7   open up the door. And we found the guy physically
8   assaulting this girl on the bed.

9      Now, I don't know what the -- I can't remember
10   what that was all about, whether he just flipped out or
11   he was drunk or high. I don't know.

12   Q. Well, what led you to believe that it was a
13   john and a prostitute?

14   A. Because the girl was a prostitute. She was --
15   she was actually living there on a regular basis. I
16   mean, she was there on a daily basis.

17   Q. Do you remember her name?

18   A. No. I'd remember her face if I saw her
19   picture, but I don't remember her name. I can't
20   remember.

21   Q. Now, you say she was living there almost on a
22   daily basis. Over what period of time?

23   A. She seems like she was there for many weeks,
24   yeah, in one period of time. I mean, she wasn't there
25   like over a course of a year, but there was a time

34

1   period when she was there for week after week.

2   Q. Now, were there other prostitutes that stayed
3   at the motel in a similar fashion? They'd stay there
4   for extended periods of time, and then they'd leave and
5   they'd come back and stay there again --

6   A. Yes.

7   Q. -- for extended periods of time?

8   A. There were some that stayed on a daily basis.
9   They might rent and then just stay for the course of a
10   week. Some stayed weeks. And then there were others
11   who just were there for one night and left the next day
12   and you might see them that -- the next day again, or
13   you might not see them for a couple of days. Sort of
14   periodically they would come in.

15   Q. Well, how do you know that they were actually
16   prostitutes?

17   A. How do I know? Well, I don't know if you can
18   be a hundred percent certain about anything in life, but
19   I would say 99 percent certain just from what I observed
20   watching the traffic coming and going, the
21   conversations. The condition of the rooms was a great
22   indication.

23   Q. What do you mean about that, "The condition of
24   the rooms was a good indication"?

25   A. Well, either they were prostitutes or they're

35

1   very sexually active women, because we had to clean the
2   trash, and there was a lot of condoms, and they were in
3   the trash, in the bathroom, on the floor, sometimes in
4   the bed. So that was ...

5   Q. And you had to clean up these rooms -- what? --
6   was it a daily basis or whenever a guest left or what?
7   How did that work?

8   A. Well, if they left the room, then we'd go and
9   clean the room completely for that day so they'd be
10   ready for the next day.

11      Some girls, if they stayed, they kind of like
12   brought in some of their stuff and it kind of was like
13   their room. So we'd go in and say, "If there's anything
14   you need," you know, if they needed towels, or, "Do you
15   want me to vacuum your floor?" things of that nature.

16   Q. Now, the Patel family, how would you describe
17   them in terms of their involvement with the motel? Were
18   they, on one end of the spectrum, standoffish, they
19   never came down to the motel and pretty much left it up
20   to you and Kellie? Or on the other end of the spectrum,
21   were they, what some people might say, hands-on, there
22   on a regular basis? Or something in between? How would
23   you describe it?

24   A. I would say hands-on. I would say they were --
25   we saw them and heard from them pretty much every day.

36

1    Q.  As far as you could tell, did it appear to you
2  that any members of the Patel family were aware of the
3  prostitution that was going on at the motel?
4    A.  Were they aware of it?
5    Q.  Yeah.
6    A.  Absolutely.
7    Q.  And why do you say that?  How do you know that?
8    A.  Because they were there.  They were there.
9  They saw it.  They were there on a daily basis,
10  sometimes more than once a day.
11    Q.  Well, how do you know that they would know what
12  a prostitute looked like?
13         MR. WEISER:  I'm going to object.  It calls for
14  speculation.
15         MR. CASEY:  Q.  You can answer.
16    A.  Okay.  I couldn't tell you what they would
17  think what a prostitute looked like, but I mean, you
18  know, what most people would think a prostitute looks
19  like, it was pretty evident.  You would have to be
20  pretty naive or, you know, completely unaware not to
21  recognize what was going on as far as prostitution.
22    Q.  Were there occasions when Rita Patel was at the
23  motel when there were prostitutes there on the premises?
24    A.  Yes.
25    Q.  And were there occasions where Rita was at the

                                                     37

1  motel when prostitutes were out either on the sidewalks
2  in front of the rooms or in the parking lot?
3    A.  Yes.
4    Q.  All right.  And about how many times did you
5  see that occur, where Rita was present and the
6  prostitutes were out in the open at the motel?
7    A.  Quite frequently.  I mean, there was times when
8  there was a lot of girls there.  I mean, they were all
9  over the place.  You couldn't miss it.  I mean, there's
10  no way.
11    Q.  What about David Stafford?  Were there
12  occasions where he was present at the motel when the
13  prostitutes were out from the rooms and either in front
14  of the rooms or out in the parking lot?
15    A.  Yes.
16    Q.  And how often did that occur?
17    A.  Rather frequently.  I mean, this was a period
18  of time when -- occurred over a long period of time, so
19  I mean ...
20    Q.  What occurred over a long period of time?
21    A.  The girls being at the motel.  I mean, if you,
22  were going to come to the motel on a daily basis, and
23  the girls being there over the course of time that they
24  were, I mean, there was just -- there would be
25  absolutely no way you could not be aware of it.

                                                     38

1    Q.  Did you ever actually see Rita talking to any
2  of the prostitutes?
3    A.  I can remember a few conversations.  Not that
4  often, but there were a few.
5    Q.  And you actually witnessed or saw Rita and a
6  prostitute conversing with each other?
7    A.  Yes.
8    Q.  Did you overhear what was being said?
9    A.  I can't recall what was being said.  I remember
10  a couple of times her going with me to a room over some
11  particular -- it would be a girl's room.  And I can't
12  remember what was said and what we were looking for,
13  whether to see who was in the room or something of that
14  nature, if there was -- you know.
15    Q.  Were there ever any occasions where you
16  actually saw David speaking to a prostitute at the
17  motel?
18    A.  I can recall a few just verbal exchanges.  I
19  don't remember any lengthy conversations, but I can
20  remember girls passing by and maybe saying something.
21    Q.  I'm not just talking about any single girl.  I
22  mean, I'm talking about someone that you felt was a
23  prostitute that was engaged in a conversation --
24    A.  Oh, yeah, yeah.
25    Q.  -- with David.

                                                     39

1    A.  Yes.
2    Q.  Did you ever overhear any of those
3  conversations?
4    A.  I don't think there was much to the
5  conversation, actually.  It was -- it might have just
6  been, "Hey, what's going on?" or whatever, you know,
7  just ...
8    Q.  Did you know any of the girls' pimps?
9    A.  Not really.  Most of the -- Kellie seemed to
10  have more contact with them since they came into the
11  office of the -- you know, and rented the rooms.
12         I kind of made a point not to know people --
13  those people.  I tried to have tunnel vision a little
14  bit on that because, you know, I just --
15    Q.  On who?  The pimps?
16    A.  The pimps, yeah, basically.
17    Q.  Why?
18    A.  I don't know.  I just didn't like them.  I just
19  thought they -- you know, I'm not for prostitution, but
20  they're human beings, and I thought a lot of these girls
21  were being really manipulated and abused, and I just
22  didn't like the scene.  I didn't really care for the,
23  character of a pimp.
24    Q.  Yeah.  Can you describe for me the pimps you do
25  recall seeing that were working or running their girls

                                                     40

1    Q.   Well, do you recall any conversation at all
2  that you had with either Rita, David, or Raman about,
3  well, if the prostitutes are going to stay at the motel,
4  they had to follow certain rules?
5    A.   Those conversations -- that was usually a
6  conversation that would occur probably between Rita and
7  Kellie, about -- and then I would hear about it.
8    Q.   All right.
9    A.   That's usually what happened.
10   Q.   What was your understanding of what the rules
11 were for the prostitutes to follow if they were going to
12 stay at the motel?
13   A.   I believe that some of the rules were that they
14 were not to, like, leave the grounds and go out on the
15 streets.
16       They were not -- there was like a dress code,
17 that they were to sort of tone down their -- you know,
18 the way they were dressing and not dressing, hot pants
19 and things of that nature, just kind of plain clothes.
20       Not to go out to cars and -- when cars would
21 pull into the parking lot, they were not to leave their
22 rooms and go out to cars.  They were supposed to stay in
23 their rooms.
24       Those are the three main things that I can
25 recall.

53

1    Q.   Was there any kind of a curfew rule, where the
2  girls were not supposed to come outside or do their
3  activity after a certain time?
4    A.   Yes.  I believe there was.
5    Q.   Do you remember what that time was?
6    A.   I think it was 9 o'clock.
7    Q.   Now, were these rules that you and Kellie came
8  up with and told the prostitutes that they had to
9  follow?
10   A.   No.
11   Q.   So based on a conversation you had with Kellie,
12 it was your understanding that these were rules that
13 were set up by the Patel family?
14   A.   Yes.
15   Q.   Did you ever have any conversation at all with
16 anyone in the Patel family about these rules or whether
17 you were enforcing them or they felt there was a
18 problem, that you guys weren't doing a good enough job
19 to make sure the girls were following those rules?
20   A.   There might have been things mentioned about
21 the rules and whether, you know, they were being
22 enforced correctly.
23       I didn't -- I don't recall having too many
24 conversations directed at me as far as that, but I
25 believe Kellie had conversations like that.

54

1    Q.   Well, did you overhear any of those
2  conversations that Kellie had with them?
3    A.   Yeah.  I've heard that mentioned.
4    Q.   All right.  What did you hear mentioned in that
5  regard?
6    A.   Well, to emphasize the rules that we just spoke
7  about, make sure that the girls are not, you know, going
8  to the cars.
9        Because, obviously, you know, they would be
10 there, the Patels, various members would be there and
11 maybe observe something and see a girl go to a car or
12 see a girl dressed a particular way and may comment, to
13 Kellie usually, "Hey, I saw" -- this or that.  You know,
14 "You got to tell these girls not to" -- dress or go out
15 to a car, whatever.
16   Q.   All right.  Who did you see in the Patel family
17 that actually saw one of the girls and then went up to
18 Kellie and reminded Kellie to enforce the rule?
19   A.   I didn't see it.  I'm just -- what I'm saying
20 is that I know that it was observed -- they observed it,
21 whether just passing by or pulling onto the -- into the
22 parking lot, seeing a girl dressed in a particular
23 fashion or going to a car and then making mention of it
24 later.
25   Q.   Who did you overhear make mention of it later

55

1  to Kellie?
2    A.   Rita.
3    Q.   How many times did you hear Rita make a comment
4  like that to Kellie about the rules?
5    A.   I don't know exactly how many times she did it,
6  but I know it occurred a number of times --
7    Q.   All right.
8    A.   -- if there was -- if she observed something
9  that wasn't -- which sometimes you didn't have control
10 over because sometimes a girl would just -- they were
11 told but they would just go, and they -- and sometimes
12 that was the way it was.
13   Q.   Now, at some point, did you and Kellie get
14 instruction that you had to charge a different rate to
15 the prostitutes and their pimps?
16   A.   Yes.
17   Q.   When did you first get that instruction?
18   A.   You know, I can't recall when that first
19 started.  I remember that the girls were coming, renting
20 the room at the normal room rates.  After a period of
21 time, which I cannot recall, we were asked to increase
22 the rates for the girls.
23   Q.   Who asked you to increase the rates for the
24 prostitutes?
25   A.   Well -- it was Rita.

56

1    A.  I assume he did.

2    Q.  Why do you assume that?

3    A.  He lives there.  He's a member of the family.

4    I mean, he -- you know, he had access to all the

5    information that everybody else did.

6    Q.  The last couple of months that the motel was in

7    business, is it true that most of the business was from

8    prostitutes during that period of time?

9    A.  Yes.

10    Q.  Okay.  Is it fair to say that approximately 85

11    to 90 percent of the motel's business in September and

12    October of 2005 was from prostitution or prostitutes?

13    A.  I would say so.

14    Q.  And what would you say would be a reasonable

15    estimate of the amount of money that was taken in by the

16    motel from June, July, and August of 2005 from

17    prostitution or prostitutes?

18    A.  A total figure for those three months?

19    Q.  Yeah, a percentage.  How much from prostitutes?

20    A.  90 percent, 95 percent.

21    Q.  Well, how long did it appear to you that 90

22    percent or so --

23    A.  I mean, I don't know.  I'm guessing, but I'm

24    thinking most of it.

25    Q.  All right.  For how long of a period of time

81

1    had most of the money that was coming in from the motel

2    come in from prostitution or prostitutes?

3    A.  I would say, through the course of the year

4    2005 -- I don't know if it would even out a little bit

5    when the Mexican workers were there because they paid,

6    you know, so much a week and things might even out a

7    little more in that period of time.  But other than

8    that, I would say that the majority of the year was --

9    that most of the money came from prostitution.

10    MR. CASEY:  Okay.

11    (Plaintiff's Exhibit 5 - 14 were marked

12    for identification by the reporter.)

13    MR. CASEY:  All right.  I've had several color

14    copies of -- and, actually, some black-and-whites marked

15    as exhibits.

16    Frank, these are the same photographs,

17    essentially, that we marked yesterday with the girls.

18    MR. WEISER:  Oh, okay.

19    MR. CASEY:  Yeah.  I'm not showing all of the

20    photographs but most of the ones -- the headshots of the

21    girls are included.

22    MR. WEISER:  Sure.

23    MR. CASEY:  Q.  I'm going to show you

24    Exhibit 5, Mr. Savano.  Do you recognize the woman

25    shown in that exhibit?

82

1    A.  Yes.

2    Q.  And do you recognize her as being a prostitute?

3    A.  Yes.

4    Q.  Do you know her name?

5    A.  No, but I tagged her a -- kind of a joke name.

6    I don't remember her real name, but I called her

7    "Southern Girl" because she had a Southern accent.  She

8    was from Tennessee, so I made that up.

9    Q.  All right.  Did the woman shown in that

10    exhibit -- did she rent rooms at the Llano Motel?

11    A.  Yes.

12    Q.  And as far as you know, did she conduct

13    prostitution activity in the rooms?

14    A.  Yes.

15    Q.  Did you observe her bring men in and out of the

16    rooms that she rented at the motel?

17    A.  Yes.  She was a girl who stayed there kind of

18    on a regular basis.  She stayed there over a period of

19    weeks.  And her room was like the hangout room.  That

20    would be a room where the girls would all kind of hang

21    out in that room sometimes.

22    Q.  Let me show you what's been marked Exhibit 6.

23    Do you recognize the girl in that exhibit?

24    A.  Yes, I do.

25    Q.  And do you recognize her as being a prostitute?

83

1    A.  Yes.

2    Q.  Is she a prostitute that stayed at the motel?

3    A.  Yes.

4    Q.  And is this a prostitute that conducted

5    prostitution activities in the motel room?

6    A.  Yes.

7    Q.  Did you observe her bringing -- or having men

8    go in and out of her room that she stayed in at the

9    motel?

10    A.  Yes, I did.

11    Q.  Did you observe her solicit men in the parking

12    lot either when they were on foot or in their vehicles?

13    A.  Yes.

14    Q.  Was she one of the regulars?

15    A.  Yeah.  For a while, she was, yeah.  Over a

16    period of time, she was.

17    Q.  Do you know her name?

18    A.  Don't recall her name.

19    Q.  All right.  Let me show you what's been

20    marked Exhibit 7.  Do you recognize that girl?

21    A.  Yes, I do.

22    Q.  And do you recognize her as being a prostitute?

23    A.  Yes.

24    Q.  Do you know her name?

25    A.  No.  I don't know her name, either.

84

BRIEN J. FARRELL, City Attorney (SBN 088318)
MICHAEL J. CASEY, Assistant City Attorney (SBN 095730)
City of Santa Rosa
100 Santa Rosa Avenue, Room 8
P. O. Box 1678
Santa Rosa, California 95402

Telephone:  (707) 543-3040
Facsimile:  (707) 543-3055

Attorneys for Plaintiff City of Santa Rosa

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SONOMA

| | |
|---|---|
| CITY OF SANTA ROSA,<br><br>                    Plaintiff,<br>v.<br><br>RAMAN D. PATEL, individually and as trustee of the Raman D. and Jashu R. Patel Family Trust, Raman D. and Jashu R. Patel Residual Trust and Raman D. and Jashu R. Patel Survivor's Trust, JAS 4 RAY PROPERTIES, L.P., RITA PATEL, and DOES 1-20,<br><br>                    Defendants.<br>_____ / | Case No. SCV-237667<br><br>**[PROPOSED] FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF UNDER RED LIGHT ABATEMENT LAW AND ABATEMENT OF NUISANCE; UNLAWFUL BUSINESS PRACTICES**<br><br>(Unlimited Civil Case)<br><br>[Penal Code § 11225 et. seq.; C.C.P. § 731; Business and Professions Code §17200 et. seq.] |

The CITY OF SANTA ROSA, a municipal corporation and charter city, as plaintiff,

alleges:

### Preliminary Allegations

1.    The City of Santa Rosa (the City) is a municipal corporation and a charter city

organized under California law.

2.    DOES 1-20 are fictitious defendants as their names and capacities are unknown.

This complaint will be amended accordingly when their names and capacities are ascertained.

3.    The owners of the real property located at 2400 Santa Rosa Avenue, Santa Rosa,

1  California, are listed in the County Assessor's records as Raman D. Patel, as Trustee of the

2  Raman D. and Jashu R. Patel Residual Trust and Raman D. Patel, as trustee of the Raman D. and

3  Jashu R. Patel Survivors Trust. This property is described as APN 044-041-060 and the legal

4  description is attached as Exhibit 1. It is commonly known and referred to as the Llano Motel.

5      4.    Allegations of any act of defendants also mean and include their officers, agents,

6  managers, representatives, employees or Does 1 through 20. And these allegations mean that

7  these acts were done and authorized while actively engaged in the operation, management,

8  direction or control of the affairs of the defendants and within their course and scope of duties.

9      5.    Defendants own and operate the Llano Motel, which has a reputation of being a

10  place of prostitution. Prostitutes, and their pimps, use rooms at this motel where they engage in

11  acts of prostitution. They also use the motel premises to make arrangements for prostitution

12  activities both at the motel and elsewhere in the city. Along with these illegal activities, other

13  criminal enterprises, including illegal narcotics trafficking, take place at and through the Llano

14  Motel.

## FIRST CAUSE OF ACTION

### Abatement of a Public Nuisance

### (Penal Code § 11225 et. seq., Code of Civil Procedure § 731,

### Civil Code §§ 3479, 3480)

19      6.    This action is brought under Penal Code § 11226, Code of Civil Procedure

20  Section 731 and Santa Rosa City Code § 1-28.010(B). All of these provisions authorize the City

21  Attorney to bring this action.

22      7.    Defendants have caused, maintained, and permitted a continuing public nuisance

23  on their property at 2400 Santa Rosa Avenue. They own and operate a building on this property

24  that is used for the purpose of prostitution. And they own and operate a place, at this location,

25  upon which acts of prostitution occur. For example,

26          a)    May 7, 2005: Two prostitutes were contacted by the police at the Llano

27              Motel. Both admit that they had been arrested on prostitution charges in

28              several counties, and both are on probation. They also admit they had

been staying at the motel for several days and had earned approximately $1,300. Both prostitutes were arrested for Penal Code § 653.22(a) - loitering with the intent to commit prostitution. The arresting officer noted, in his report, that the Llano Motel is frequently used by prostitutes from out of the area. And he reported that the motel is referenced on internet sites as the best place in Santa Rosa for out of the area prostitutes to stay and work.

b) May 19, 2005: A John (male customer of a prostitute) tells police that he picked up a prostitute hanging out in front of the Llano Motel. He admits he drove into the motel parking lot because he had prior contacts with prostitutes there. On this date, the John met the prostitute and she offered oral sex for $40. The John admitted to meeting prostitutes at the Llano Motel three times. On two of these occasions, they used the motel rooms.

c) May 31, 2005: An undercover officer pulled into the Llano Motel parking lot. After he got out of his car, a woman walked out from one of the rooms and told him the charge was $100. When the officer told her he only had $20, he asked how much she would charge for a "half and half". She responded that it would cost him $80 and that they could use her motel room.

d) June 30, 2005: The police arrest a pimp at the Llano Motel for forcing a 19-year old girl to perform acts of prostitution at the motel. The victim had been forced to prostitute herself with six different men during the evening before. The pimp and the victim, as well as another prostitute, were staying at the Llano Motel, where the forced acts took place.

e) August 21, 2005: Police investigate an assault and robbery at the Llano Motel. After a John had sex with a prostitute in one of the motel rooms, he was beaten and robbed.

f) October 22, 2005: A John was contacted by the police after he left the

1  motel. He admitted to having oral sex in room #10 for $30. The only

2  reason he went there is because his friends said that the motel was the

3  place to go to get a prostitute.

4  Several undercover officers were solicited for prostitution. And

5  approximately 10 prostitutes were found using and/or working several

6  rooms at the motel.

7  The police arrested the co-managers for pimping and running a house of

8  prostitution. They admitted to the officers that the owners of the motel

9  encouraged the renting of rooms to prostitutes. And they admitted that the

10  owners set the prices and "house rules" for the prostitutes. Generally, the

11  room rate is $54.50 daily, for a single person, and $65.00 for two persons.

12  Hookers and pimps are charged approximately $150.00 per girl whether or

13  not they share a room. One of the managers admitted to the police that the

14  majority of the motel's business is from prostitutes.

15     8.    Defendants' maintenance of their property in this condition is a continuing public

16  nuisance as defined in Civil Code §§ 3479 and 3480. And it constitutes a public nuisance under

17  the Red Light Abatement Law contained in Penal Code § 11225 et. seq. Their property affects

18  the entire community and neighborhood. Its current condition is injurious to health, offensive to

19  the senses, and unlawfully obstructs the free use of the property and neighboring properties by

20  interfering with the comfortable enjoyment of life and property. This condition is objectionable

21  to the neighborhood and the community at large. And this condition renders the property a

22  "nuisance per se."

23     9.    Plaintiff believes that the defendants will continue to permit this illegal activity

24  and nuisance to occur. This will continue to cause irreparable injury and harm to the public's

25  health, safety and welfare.

26     10.    Plaintiff has no adequate remedy at law.

27     11.    Plaintiff believes that defendants will not abate or remove the nuisance within a

28  reasonable period of time. If it becomes necessary for the City to abate the nuisance, substantial

First Amended Complaint for Injunctive Relief          4

1   costs will be incurred.  Therefore, plaintiff requests recovery of its costs to abate and remove the

2   nuisance and establish a prior lien on the property for these costs.

3               SECOND CAUSE OF ACTION

4                 Unlawful Business Practices

5          (Business and Professions Code §17200, et seq.)

6       12.    Plaintiff incorporates by reference Paragraphs 1 through 10 as though fully set

7   forth herein.

8       13.    Defendants' maintenance of their property, and the operation of their motel in the

9   above-described condition, was an integral part of their unlawful and unfair business practice.

10  This practice consisted of, among other things, permitting and encouraging prostitution, acts of

11  prostitution and solicitation of prostitution on their business premises.  This practice also

12  consisted of charging and collecting higher room rates from prostitutes and/or their pimps than

13  what was charged and collected from regular customers.  Consequently, defendants gained an

14  unfair business advantage over similarly situated business operators and unfairly and illegally

15  profited from the criminal activity they permitted to occur on their business premises.

16      14.    Plaintiff believes that the defendants' actions violate, inter alia, *California Civil*

17  *Code §3479*, as well as *California Penal Code §§266i:, 266h, 315, 316, 653.22 and 11225*, et.

18  seq.

19      15.    Defendants threaten to, and unless restrained will, continue to engage in these

20  unlawful business practices.  In addition to seeking injunctive relief to enjoin these practices and

21  conditions, plaintiff also requests restitution and disgorgement of all profits and earnings made as

22  a result thereof.  Furthermore, plaintiff seeks the appointment of a receiver under *Business &*

23  *Professions Code §17203*.

24      16.    Finally, plaintiff requests that a civil penalty of $2,500 be imposed against

25  each defendant for each underlying predicate act or violation of law constituting an unlawful

26  business practice.

27      WHEREFORE, Plaintiff prays for judgment as follows:

28      1.    That the property, building(s) and place(s) located at 2400 Santa Rosa Avenue,

First Amended Complaint for Injunctive Relief          5

1  Santa Rosa, California, and the existing conditions thereon, be declared in violation of Penal

2  Code §§ 11225, et. seq., and Civil Code § 3479 et. seq.

3      2.    For a temporary restraining order, preliminary injunction and a permanent

4  injunction to perpetually enjoin the defendants, lessees, agents, successors, heirs, assigns, and

5  subsequent owners, lessees and agents, from directly or indirectly maintaining or permitting the

6  nuisance and from conducting unfair business practices.

7      3.    That defendants' property, including all buildings upon it, at 2400 Santa Rosa

8  Avenue, Santa Rosa, California be declared a continuing public nuisance.

9      4.    That defendants be perpetually enjoined from maintaining a public nuisance on

10  their property, and that they be ordered to abate all conditions that cause the nuisance.

11      5.    That an order of abatement be entered as part of the judgment in this case

12  directing that all fixtures, musical instruments and moveable property used in conducting,

13  maintaining, aiding, or abetting the nuisance be removed from the buildings at 2400 Santa Rosa

14  Avenue and sold in the manner provided for the sale of chattels under execution.

15      6.    That all buildings on the premises at 2400 Santa Rosa Avenue be closed against

16  use for any purpose, and kept closed for a period of one year.  In the alternative, if the court finds

17  that any vacancy resulting from closure may create a nuisance or that closure is otherwise

18  harmful to the community, the court should order the defendants to pay damages in an amount

19  equal to the fair market rental value of the buildings on the premises for one year to the City.

20      7.    For fees and sums incurred for removing and selling the movable property and for

21  closing the premises and keeping them closed.

22      8.    For a civil penalty of $25,000 against each defendant pursuant to Penal Code §

23  11230(b).

24      9.    That defendants be ordered to disgorge and/or make restitution of all profits

25  gained from their wrongful conduct and their unlawful business practices.

26      10.    For civil penalties under *Business & Professions Code §17206.*

27      11.    That the abstract of judgment in this case constitutes a prior lien over any other

28  that may be held on the properties.

First Amended Complaint for Injunctive Relief      6

1      12.    That plaintiff recover costs of suit from defendants, their successors, heirs and

2  assigns, including attorneys' fees, and expenses for investigation, enforcement and prosecution.

3      13.    That a receiver be appointed under Code of Civil Procedure §564 and *Business &*

4  *Professions Code* §17203.

5      14.    That plaintiff is entitled to such other relief as the court deems proper and just.

6

7

8  Dated:   January *18* , 2007

MICHAEL J. CASEY
Assistant City Attorney
9                                                    Attorney for Plaintiff

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

First Amended Complaint for Injunctive Relief          7

**EXHIBIT 1**

## EXHIBIT "A"

All that real property situated in an unincorporated area, County of Sonoma, State of California, described as follows:

## PARCEL ONE:

Being a portion of the lands of J. P. Crowther, as said lands are described in Book 1173 of Official Records, page 95, and being more particularly described as follows:

Beginning at the Southwest corner of said lands of Crowther, said point also being on the Easterly line of Santa Rosa Avenue; thence from said point of beginning along the Southerly line of Said lands of Crowther North 89° 37' 40" East (Deed North 39° 45' East) 261.50 feet to a ½" iron pipe; thence North 1° 11' 30" West, 153.60 feet to a ¼" iron pipe; thence North 45° 07' West 23.09 feet to a ½" iron pipe; thence South 89° 37' 40" West, 245.10 feet to a ½" iron pipe marking the Easterly line of said Santa Rosa Avenue; thence along the Easterly line of said Avenue South 0° 11' 30" East 170.00 feet to the point of beginning.

Excepting from the above Parcel One the following: That certain portion of the lands of J. P. Crowther as said lands are described in Book 1173 of Official Records, page 95, of said Sonoma County, more particularly described as follows:

Beginning at the Southwest corner of said lands of Crowther, said point also being on the Easterly line of Santa Rosa Avenue (100.00 feet wide); thence North 00° 11' 30" West, along the Westerly line of said lands of Crowther and along said Santa Rosa Avenue, a distance of 140.00 feet; thence North 89° 37' 40" East, parallel with the Southerly line of said lands of Crowther, a distance of 150.00 feet; thence South 00° 11' 30" East, parallel with said Easterly line of Santa Rosa Avenue, a distance of 140.00 feet to the Southerly line of said lands of Crowther; thence South 89° 40' West (South 89° 45' 00" West record per said deed to Crowther), along said Southerly line of the lands of Crowther, a distance of 150.00 feet to the point of beginning.

## PARCEL TWO:

Being a portion of the lands of J. P. Crowther, as said lands are described in Book 1173 of Official Records, page 95, and being more particularly described as follows:

Commencing at the Southwest corner of said lands of Crowther, said point also being on the Easterly line of Santa Rosa Avenue; thence from said point along the Southerly line of said lands of Crowther, North 89° 37' 40" East (Deed North 89° 45' East) 261.50 feet to a ½" inch iron pipe; thence North 0° 11' 30" West 153.60 feet to a ½ inch iron pipe, said point being the TRUE POINT OF BEGINNING of the herein described parcel of land; thence from said point of beginning North 45° 07' West, 23.09 feet to a ½ inch iron pipe; thence South 89° 37' 40" West, 245.10 feet to a ½ inch iron pipe marking the Easterly line of said Santa Rosa Avenue; thence North 0° 11' 30" West and along said Easterly line 30.00 feet to a point; thence North 89° 37' 40" East 261.50 feet to a ½ inch iron pipe; thence South 0° 11' 30" East 46.40 feet to the true point of beginning.

2002180559

OFFICIAL RECORDS OF
SONOMA COUNTY
EEVE T. LEWIS



RECORDING REQUESTED BY
ATTORNEY

AND WHEN RECORDED, MAIL THIS DEED AND,
UNLESS OTHERWISE SHOWN BELOW, MAIL TAX
STATEMENTS TO:

ALLEN T. RATCLIFFE, JR.
Attorney at Law
156 Diablo Road
Suite 310
Danville, CA 94526

GENERAL PUBLIC
11/19/2002 08 37 DEED
RECORDING FEE. 10.00    2

Title Order No. _____ Escrow No. _____
MAIL TAX STATEMENTS TO:

DOCUMENTARY TRANSFER TAX NONE; TRANSFER BY REASON OF DEATH;
NO CONSIDERATION; NOT PURSUANT TO A SALE
___ COMPUTED ON FULL VALUE OF PROPERTY CONVEYED; OR
___ COMPUTED ON FULL VALUE LESS LIENS AND ENCUMBRANCES
REMAINING AT TIME OF SALE

_____
ALLEN T. RATCLIFFE, JR.

### GRANT DEED

RAMAN D. PATEL, as Successor Trustee of the RAMAN D. AND JASHU R.
PATEL FAMILY TRUST, UTD 11/25/88

DO HEREBY GRANT, TRANSFER AND CONVEY TO

RAMAN D. PATEL, as Trustee of the RAMAN D. AND JASHU R. PATEL RESIDUAL
TRUST, UTD 11/25/88, as to an undivided fifty percent (50%) interest;
and RAMAN D. PATEL, as Trustee of the RAMAN D. AND JASHU R. PATEL
SURVIVOR'S TRUST, UTD 11/25/88, as to an undivided fifty percent (50%)
interest

ALL RIGHT, TITLE AND INTEREST IN AND TO THAT CERTAIN REAL PROPERTY SITUATED IN AN UNINCORPORATED AREA, COUNTY OF
SONOMA, STATE OF CALIFORNIA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

SEE EXHIBIT "A," ATTACHED HERETO AND MADE A PART HEREOF
Assessor's Parcel Number:  044-041-066
Commonly known as  2400 Santa Rosa Ave., Santa Rosa, CA 95401

NOTE 1: This deed vests title in the name of the above identified person or entity by reason of the death of a person and is
exempted pursuant to Revenue and Tax Code §11930 from taxes imposed by Revenue and Tax Code §11911.
NOTE 2: Transfer to a trustee for the beneficial use of a surviving spouse and which takes effect upon the death of a spouse
which is exempt from reassessment pursuant to Revenue and Tax Code §§63(a) and 63(b).

Executed on  10-29th , 2002, at  Santa Rosa , California.

STATE OF CALIFORNIA        )
                           ) ss.
COUNTY OF Sonoma           )

ON 10/09 , 2002, BEFORE ME, THE UNDERSIGNED,
NOTARY PUBLIC, PERSONALLY APPEARED RAMAN D. PATEL,
TRUSTEE, PERSONALLY KNOWN TO ME (OR PROVED TO ME ON
THE BASIS OF SATISFACTORY EVIDENCE) TO BE THE PERSON
WHOSE NAME IS SUBSCRIBED TO THE WITHIN INSTRUMENT
AND ACKNOWLEDGED TO ME THAT HE EXECUTED THE SAME IN
HIS AUTHORIZED CAPACITY, AND THAT BY HIS SIGNATURE ON
THE INSTRUMENT THE PERSON, OR THE ENTITY ON BEHALF OF
WHICH HE ACTED, EXECUTED THE INSTRUMENT.
WITNESS MY HAND AND OFFICIAL SEAL.

_____
SIGNATURE
Mail tax bills as directed above.

_____
RAMAN D. PATEL, Trustee

OFFICIAL SEAL  1240189
CYNTHIA HANSON
NOTARY PUBLIC CALIF
COUNTY OF SONOMA
My Comm Exp Jan. 11, 2004

RECORDING REQUESTED BY
ATTORNEY
AND WHEN RECORDED, MAIL THIS DEED AND,
UNLESS OTHERWISE SHOWN BELOW, MAIL TAX
STATEMENTS TO:

ALLEN T. RATCLIFFE, JR.
Attorney at Law
156 Diablo Road
Suite 310
Danville, CA 94526

**2003051571**

OFFICIAL RECORDS OF
SONDMA COUNTY
EEVE 7  LEWIS

GENERAL PUBLIC
03/18/2003 02:35 DEED
RECORDING FEE: 13.00

3



Title Order No. _____  Escrow No. _____

MAIL TAX STATEMENTS TO:

RAMAN D. PATEL
508 Dennett Court
Rohnert Park, CA 94928-1710

GRANT DEED

THIS DOCUMENT IS BEING RE-RECORDED TO CORRECT THE SEQUENCE OF RECORDING